LUMBEE RIVER ELECTRIC MEMBERSHIP CORPORATION AND NORTH CAROLINA ELECTRIC MEMBERSHIP CORPORATION v. THE CITY OF FAYETTEVILLE, THE PUBLIC WORKS COMMISSION OF THE CITY OF FAYETTEVILLE, AND SOUTHWEST DEVELOPMENT CORPORATION OF CUMBERLAND COUNTY

No. 126PA83

(Filed 6 December 1983)

**1. Appeal and Error § 10.1— allowance of motion to amend record on appeal**

A motion pursuant to Appellate Rule 9(b)(6) to amend the record on appeal to include an affidavit which was attached to defendant city's response to plaintiffs' motion for a preliminary injunction was allowed by the Supreme Court.

**2. Electricity § 2.3— city's extension of electric service outside corporate limits—within reasonable limitations**

The City of Fayetteville's extension of electric service to a residential subdivision located four miles outside the corporate limits and within territory assigned by the Utilities Commission to plaintiff electric membership corporation was "within reasonable limitations" as that term is used in G.S. 160A-312 and was therefore proper where the evidence showed that Fayetteville was serving 22 customers and plaintiff was serving five customers within a one-half mile radius of the subdivision entrance; within a one mile radius of the same point Fayetteville was serving 229 customers and plaintiff was serving 75 customers; the development of the subdivision requires a three-phase electrical power supply; Fayetteville has had a three-phase line immediately adjacent to the subdivision since 1973, and on the date this action was filed such three-phase service was available directly across the street from the entrance to the subdivision tract; plaintiff had only a single-phase line within 170 feet of the entrance to the subdivision, and its nearest three-phase line was located approximately 1,850 feet from the nearest boundary of the subdivision and 3,174 feet from the entrance to the subdivision; and it would have required five days construction time and an expenditure of $11,700 to make plaintiff's three-phase service available to the subdivision.

**3. Rules of Civil Procedure § 41— nonjury trial—dismissal of action**

In a nonjury case, G.S. 1A-1, Rule 41(b) provides a procedure whereby, at the close of plaintiff's evidence, the judge can give judgment against plaintiff not only because his proof has failed in some essential aspect to make out a case but also on the basis of facts as he may then determine them to be from the evidence then before him.

**4. Electricity § 2.3— city's extension of electricity outside city limits—construction of charter and statute together**

A provision of the city charter of Fayetteville authorizing the city to extend its electric system and to sell electricity anywhere within Cumberland County must be construed together with G.S. 160A-312 with the result that

Lumbee River Electric Corp. v. City of Fayetteville

the City of Fayetteville can only extend electric service outside its corporate limits "within reasonable limitations."

ON discretionary review of a decision of the Court of Appeals, 60 N.C. App. 534, 299 S.E. 2d 305 (1983), reversing a judgment in favor of defendant-appellants entered on 1 October 1981 by *Braswell, J.*, in Superior Court, CUMBERLAND County. Heard in the Supreme Court 13 September 1983.

Plaintiffs (Lumbee River Electric Membership Corporation is hereinafter referred to as the "EMC") instituted this action on 1 June 1981 by filing a complaint seeking a temporary restraining order, preliminary injunction and permanent injunction prohibiting the City of Fayetteville and the Fayetteville Public Works Commission (hereinafter "Fayetteville") from furnishing electric service to a new residential subdivision (Montibello) owned by Southwest Development Corporation and located approximately four miles outside the corporate limits of the City of Fayetteville. On the basis of the verified complaint, Judge Lee issued a temporary restraining order restraining Fayetteville from further constructing and upgrading electric service facilities to the subdivision in question pending a hearing on the request for a preliminary injunction. Following a hearing on the request for a preliminary injunction, held 19 June 1981, Judge Brannon found as a fact that plaintiffs had failed to show a likelihood of success on the merits. Judge Brannon therefore dissolved the temporary restraining order and denied the request for a preliminary injunction. The case was subsequently heard on its merits by Judge Braswell, sitting without a jury. At the close of plaintiffs' evidence, and prior to presentation of Fayetteville's evidence, Fayetteville moved for a directed verdict. (The trial court and the Court of Appeals properly treated Fayetteville's motion as a motion to dismiss.) By order dated 1 October 1981 Judge Braswell allowed Fayetteville's motion and entered a judgment of dismissal against plaintiffs. The plaintiffs appealed to the Court of Appeals and that court concluded that the facts found together with the stipulations of the parties did not support the trial judge's conclusions, reversed the trial court and remanded the case for further proceedings. We disagree with the result and the reasoning of the Court of Appeals' decision and, for the reasons stated herein, reverse the decision of the Court of Ap-

peals and remand the case to that court for reinstatement of judgment of the trial court.

*William T. Crisp, Joyce L. Davis and Robert F. Page, attorneys for plaintiff-appellees Lumbee River Electric Membership Corporation; and North Carolina Electric Membership Corporation.*

*Reid, Lewis & Deese, by Richard M. Lewis, Jr. and Renny W. Deese; Spruill, Lane, Carlton, McCotter & Jolly, by J. Phil Carlton, attorneys for defendant-appellants.*

*J. Phil Carlton and Ernie K. Murray, attorneys for the amicus curiae, the Towns of Scotland Neck and Shelby and the Cities of Gastonia, Greenville, Newton and Rocky Mount, North Carolina.*

MEYER, Justice.

[1]   Before proceeding with the opinion in chief, it is necessary to dispose of a motion in the cause pending before this Court.

On the day of the oral argument before this Court, Fayetteville filed a written motion pursuant to Rule 9(b)(6) of the Rules of Appellate Procedure to amend the record on appeal to include the affidavit of Mr. Claude I. Burkhead, Jr., the City of Fayetteville's chief electrical engineer. The affidavit was attached to Fayetteville's response to plaintiffs' motion for a preliminary injunction, and was thus a part of the original record proper on file and available to Judge Braswell at the hearing on the motion for preliminary injunction. The affidavit was not made a part of the record on appeal to the Court of Appeals and therefore was not originally a part of the record before this Court. Plaintiffs filed a response to Fayetteville's motion to amend the record to include the affidavit, seeking its denial on the ground that the affidavit was never formally offered into evidence before Judge Braswell at the hearing on the motion for preliminary injunction. Plaintiffs contend that because the affidavit was not formally presented in evidence, it was not a part of the trial court record. We do not agree. The affidavit was attached to a formal pleading—the response. It was therefore a part of that pleading and thus a part of the record in the case. We will assume that the able and experienced trial judge who heard the motion read

the pleadings upon which the motion was based. We have allowed the motion to amend the record on appeal.

[2] The sole issue on this appeal is whether Fayetteville's extension of electric service to the Montibello Subdivision was "within reasonable limitations" as that term is utilized in G.S. § 160A-312. We conclude that it was.

Lumbee River Electric Membership Corporation is an electric membership corporation organized pursuant to Chapter 117 of the North Carolina General Statutes and is engaged in the business of furnishing electric service in several southeastern North Carolina counties, including Cumberland County where it serves approximately 3,400 of its members. North Carolina Electric Membership Corporation (of which Lumbee River EMC is a member) is organized pursuant to the same chapter of the General Statutes and is a bulk, wholesale power supplier of its member cooperatives. The City of Fayetteville is a municipal corporation existing under the laws of North Carolina. The Public Works Commission is an agency of the city which supervises, plans and operates various public utility services of the city, including the distribution of electric service. Southwest Development Corporation is the owner of the Montibello Subdivision which is located wholly within Cumberland County, contains approximately 521 acres and is located approximately four miles from the corporate limits of the City of Fayetteville. The subdivision is residential in nature and at the time here pertinent was in the early stages of development. The subdivision is located entirely within territory assigned to the EMC by order of the North Carolina Utilities Commission in 1969. Fayetteville distributes electric service at retail both within and outside the corporate limits of the city and has distributed electric service to customers in the general area of the subdivision in question both before and since the assignment of the area to the EMC in 1969, including service to new customers within the assigned area after that date.

Prior to the commencement of this action, Southwest Development Corporation requested that Fayetteville provide the electric service for Montibello Subdivision and in fact had entered into a contract with Fayetteville whereby Fayetteville is to provide electric service to Section 1 of the subdivision. Mr. John Koenig, President of Southwest, testified at a hearing on plain-

tiffs' request for a preliminary injunction that he had requested service exclusively from Fayetteville and stated his apparent reasons for doing so:

I have scheduled an underground electrical system for section one of Montibello, and I requested in the early part of this year, in February, that PWC, Mr. Ray Munch's department, provide the power. I have other subdivisions in Cumberland County and have experience with Public Works Commission providing power to those subdivisions. I built and developed homes in what is known as Water's Edge and had power provided by PWC and then developed a new subdivision which is called Lake Shores and I have PWC in there. Montibello is my third subdivision.

I consider myself as having a fair amount of experience with the Public Works Commission providing power. I have always had timely, good service from them. I have never had any problems. We have gone with underground power in Lake Shores in the development of the first section of that subdivision, and we never have encountered any problems. I think I have established an excellent working relationship with PWC. On a daily basis, we have to work together on each individual lot and the development of each phase of construction. The well site located in Lots one and two of section one of Montibello requires three-phase power.

Around February, I requested Public Works Commission to provide the power. I have had some experience with the Commission providing power. I also have a real estate company in which we sell existing or new homes, perhaps somewhere around an average of five hundred homes per year. Over the last several years you develop an extraneous factor in what the consumer, the ultimate consumer, the home owner, would like to have. . . . My experience with reference to the dependability of power that has been provided by the Public Works Commission is excellent.

The well site requires three-phase electrical power because of the size of the subdivision and the reliability of having adequate water. . . .

I . . . entered into a contract with the Public Works Commission for the providing of power to section one of the

Montibello Subdivision. Prior to my request to the Public Works Commission to provide the electrical power to section one of the Montibello Subdivision, I knew that Lumbee River was out in that general area, but I did not know the exact location of their line. I did not make any request to Lumbee River to service Montibello. I have exclusively asked Public Works Commission to provide electrical power to the subdivision, and the power has been provided.

The two earlier subdivisions, Water's Edge and Lake Shores, are outside the city limits of Fayetteville.

When this action was begun, Fayetteville was serving 22 customers, and the EMC 5 customers within a one-half mile radius of the subdivision entrance, and within a one mile radius of the same point, Fayetteville was serving 229 customers and the EMC 75 customers.

It is quite clear from the record evidence that in order to provide adequate service to the Montibello Subdivision, three-phase (as opposed to single-phase) electric service was and is required. Fayetteville has had a three-phase line immediately adjacent to the subdivision proper since 1973. In 1981, at the request of the developer, Fayetteville extended its three-phase line some 1,148 feet to the desired connection point at the entrance to Section 1 of the subdivision. Thus on the date this action for injunctive relief was filed by plaintiffs, Fayetteville's three-phase line was in fact available directly across the street from the entrance to the subdivision tract. The EMC had no three-phase line adjacent to the subdivision but did have a single-phase electric line within 170 feet of the entrance to Section 1 of the subdivision. The single-phase line had been in existence since 1948 and was once used to serve a customer directly across the street from the subdivision entrance. Prior to 1957 that line served a residence on the tract of land now occupied by the subdivision. The EMC's three-phase line is located 1,850 feet from the nearest boundary of the subdivision and approximately 3,174 feet from the entrance to Section 1 of the subdivision. It would require 5 days for the EMC to extend its three-phase service to the subdivision and the extension would cost $11,700.00.

With this brief factual background, we move now to a consideration of Fayetteville's authority or lack thereof to serve the Montibello subdivision.

Municipalities owning and operating their own electric systems do so upon the authority of specific provisions of the city or town charter or of Article 16 of Chapter 160A of the General Statutes which allows municipalities to operate public enterprises, including "[e]lectric power generation, transmission, and distribution systems." G.S. § 160A-312 is the specific statute which authorizes municipalities to operate their various public enterprises, including electic systems, outside the corporate limits "within reasonable limitations."

At least as early as 1917 our Legislature enacted legislation authorizing a municipality to "own and maintain its own light . . . system to furnish . . . light to the city and its citizens. . . ." 1917 N.C. Public Laws, ch. 136, subch. XI, § 1. In 1929, some twelve years later, this provision was amended to add the words, "[a]nd to any person, firm or corporation desiring the same *outside the corporate limits*, where the service is available." 1929 N.C. Public Laws, ch. 285, § 1 (emphasis added). It is interesting to note that the version of the statute in effect in 1965, when the Electric Act was enacted, was then G.S. § 160-255 which did not contain the "within reasonable limitations" language. The Legislature left G.S. § 160-255 intact when it enacted the 1965 Electric Act and that statute was amended numerous times over the years until it was replaced by the current G.S. § 160A-312 in the 1971 rewrite of the "Cities and Towns" chapter of the general statutes. The "within reasonable limitations" language was not added until the 1971 rewrite. 1971 N.C. Sess. Laws, ch. 698. That language had appeared as dictum in a statement by this Court twenty years earlier in *Grimesland v. Washington,* 234 N.C. 117, 66 S.E. 2d 794 (1951). The case involved two municipal electric systems competing in a rural area in which one claimed an exclusive right to serve in an area far from its corporate limits, and the question was whether a municipality was required to have a certificate of convenience and necessity from the North Carolina Utilities Commission. The 1965 Electric Act, appearing in G.S. § 160A-331 to -338 and G.S. § 62-110.2, does not empower or authorize municipalities to operate electric systems outside corporate limits, nor does it restrict such service. Insofar as the General Statutes

are concerned, the sole authority for, and the only restriction upon municipalities furnishing electric service outside corporate limits is found in G.S. § 160A-312.

The crucial issue on this appeal, *i.e.*, whether Fayetteville's extension of service to Montibello Subdivision was "within reasonable limitations," will be determined by the proper interpretation of this Court's prior decision in *Domestic Electric Service v. City of Rocky Mount*, 285 N.C. 135, 203 S.E. 2d 838 (1974). Indeed, the parties to this action have acknowledged, as does the opinion of the Court of Appeals, that the present case is controlled by our decision in *Domestic Electric*. We find it appropriate to review the issues involved in that case and this Court's determination of those issues.

In *Domestic Electric* the City of Rocky Mount attempted to furnish electric service outside the city limits to Cokey Apartments, Ltd. A large number of apartments were under construction on a tract of land lying partially within and partially outside the city limits. The precise location of the apartments was outside the city limits in a territory assigned by The North Carolina Utilities Commission to Domestic Electric Service, Inc., a small investor-owned utility no longer in existence. Cokey requested service from the city and entered into a contract with the city for its electric service. Domestic had an adequate electric line in existence immediately adjacent to the tract on which the apartments were being constructed and the city's nearest line was 675 feet away and inside the city limits. The city began construction of a line outside the corporate limits to reach the apartments and Domestic brought a proceeding to enjoin the construction. The trial court concluded that the city had the right to serve the apartments to the exclusion of Domestic. The Court of Appeals reversed and held that Domestic in fact had the exclusive right to serve all new customers within the territory assigned to it. This Court found that the Court of Appeals erred in holding that G.S. § 62-110.2(c)(1) gave Domestic the exclusive right to serve all new customers in the territory assigned to it by the Commission. Although, based on the facts in that case, we went on to hold in *Domestic Electric* that the extension by the municipality there was not "within reasonable limitations" and therefore "affirmed" the result reached by the Court of Appeals, we clearly modified the decision of that court.

We now examine the precise considerations and holding of
*Domestic Electric* from the words of the opinion authored by
Justice Lake:

Prior to the enactment of Ch. 287 of the Session Laws of
1965, investor-owned electric power companies and electric
membership corporations, unless restricted by contract, were
free to compete, in areas outside the corporate limits of mu-
nicipalities, for the patronage of users and potential users of
electric power.

. . . .

. . . [A] municipality, operating its own electric distribu-
tion system for the service of its inhabitants, had the right,
under Ch. 285 of the Public Laws of 1929, codified as G.S.
160-255 (now G.S. 160A-312), to extend its lines beyond its
corporate limits 'within reasonable limitations' and thus to
compete in rural areas with investor-owned power companies
and with electric membership corporations.

'In the absence of a valid grant of such right by statute,
or by an administrative order issued pursuant to statutory
authority, and in the absence of a valid contract with its com-
petitor or with the person to be served, a supplier of electric
power, or other public utility service, has no territorial
monopoly, or other right to prevent its competitor from serv-
ing anyone who desires the competitor to do so.'

. . . .

Frequent litigation between investor-owned power com-
panies and electric membership corporations grew out of con-
tracts between them defining and limiting territories to be
served by each. To avoid or reduce such litigation and un-
economic duplication of transmission and distribution
systems, the investor-owned electric utilities and the electric
membership corporations, throughout the State, collaborated
in recommending to the Legislature the enactment of Ch. 287
of the Session Laws of 1965. The language of the Act was the
result of their collaboration and agreement and was carefully
chosen for the accomplishment of this purpose. The Act con-
tained two parts. The first, relating to electric service within
the corporate limits of municipalities, is codified as G.S.

160A-331 to G.S. 160A-338, including subsequent amendments not pertinent to this appeal. The second, relating to electric service outside the corporate limits of municipalities, is codified as G.S. 62-110.2.

. . . .

The second part of the Act of 1965, relating to electric service outside the corporate limits of municipalities, defines, also in great detail, the rights of, and restrictions upon, 'electric suppliers' in such areas. G.S. 62-110.2(a)(3) defines 'electric supplier' to mean 'any *public utility* furnishing electric service or any electric membership corporation.' (Emphasis added.)

. . . .

. . . [A] municipality is not an 'electric supplier' as that term is used in G.S. 62-110.2.

G.S. 62-110.2(c)(1) provides:

'In order to avoid unnecessary duplication of electric facilities, the . . . . [Utilities] Commission is authorized and directed to assign, as soon as practicable after January 1, 1966, to *electric suppliers* all areas, by adequately defined boundaries, that are outside the corporate limits of municipalities and that are more than 300 feet from the lines of all *electric suppliers* as such lines exist on the dates of the assignments * * *. The Commission shall make assignments of areas in accordance with public convenience and necessity, considering among other things, the location of existing lines and facilities of *electric suppliers* and the adequacy and dependability of the service of *electric suppliers*, but not considering rate differentials among *electric suppliers*.' (Emphasis added.)

G.S. 62-110.2(b)(8) provides:

'Every *electric supplier* shall have the *right* to serve *all premises* located wholly within the service area assigned to it pursuant to subsection (c) hereof.' (Emphasis added.)

G.S. 62-110.2(b)(10) provides:

'No *electric supplier* shall furnish electric service to any premises in this State outside the limits of any incorporated

city or town except as permitted by this section * * *. (Emphasis added.)

The Act of 1965, including G.S. 62-110.2, did not, without more, alter the competitive rights of municipalities, investor-owned utilities and electric membership corporations to compete for patronage in areas outside the corporate limits of municipalities. Any premises in any such area could, prior to an assignment of such area by the Utilities Commission, have been served by any of the three competitors chosen by the user (assuming no contract restricting competition and assuming an extension to serve such user would fall within the 'reasonable limitation,' applicable to service by the municipality).

285 N.C. at 139-143, 203 S.E. 2d at 841-843 (citations omitted).

The Court in *Domestic Electric* then went on to explain that the territory in which the apartments were located had been assigned and the assignee, Domestic, had the right to serve all premises located wholly within the territory and that no other "electric supplier," meaning no other electric membership corporation or investor-owned utility, could serve any premises located in the territory assigned to Domestic. The Court specifically held, however, that the assignment of the territory did not preclude the *city* from serving the customer:

An assignment of territory by the Utilities Commission can, of course, have no greater effect than that which is given to it by the statute, the Commission having no authority except that conferred upon it by the statute. *Utilities Commission v. Woodstock Electric Membership Corp., supra,* at p. 119.

Thus, we hold that the assignment to Domestic by the Utilities Commission of the area which includes the Cokey Apartments did not automatically preclude the City of Rocky Mount from extending its service lines into the area.

285 N.C. at 143-144, 203 S.E. 2d at 843.

Having found no impediment to the municipality's right to serve the customer by reason of the assignment of the territory

to Domestic, and finding no intent on the part of the Legislature to deprive municipal corporations of the authority to serve new customers outside the corporate limits, the Court then examined the city's authority under G.S. § 160A-312 and stated:

> Its power to extend its lines and distribute electric current beyond its corporate boundaries is expressly restricted to 'reasonable limitations.'
>
> . . . .
>
> . . . 'The term "within reasonable limitations" does not refer solely to the territorial extent of the venture but embraces all facts and circumstances which affect the reasonableness of the venture.'
>
> In the present instance, the investor-owned utility, to which the territory has been assigned by the Utilities Commission 'in accordance with public convenience and necessity,' had its service lines in the immediate vicinity of the Cokey Apartments and was ready, able and willing to serve Cokey.

285 N.C. at 144-45, 203 S.E. 2d at 844.

The Court concluded that the extension by the city of its electric service to serve Cokey Apartments would exceed "reasonable limitations" and therefore was beyond the authority of the city.

The primary issue addressed by the Court in *Domestic Electric* was whether a municipality owning its own electric distribution system could serve a new customer requesting its service where that customer was located outside the corporate limits within an area assigned by the Utilities Commission to an investor-owned utility or electic membership corporation. We answered that issue in the affirmative.

It is clear that the result reached by the Court of Appeals in the case *sub judice* was based on its mistaken belief that "[t]he facts in the present case are substantially similar to those in [*Domestic Electric*]." Though the factual situations of *Domestic Electric* and this case are *seemingly* similar they are in fact not *substantially* similar. They are seemingly similar because in both cases the customer was a residential complex near the municipality; both municipalities desired to furnish service at the

customer's request by extensions beyond their corporate limits; and the area in question had been "assigned" to an "electric supplier" who desired to furnish service. While those similarities exist, there are striking dissimilarities in those factors which are determinative, *i.e.,* those factors which bear directly on the issue of whether the extension in question was "within reasonable limitations."

In *Domestic Electric,* this Court, quoting *Service Company v. Shelby,* 252 N.C. 816, 115 S.E. 2d 12 (1960), stated: " '[t]he term, "within reasonable limitations" does not refer solely to the territorial extent of the venture but embraces *all facts and circumstances which affect the reasonableness of the venture.*' " 285 N.C. at 144, 203 S.E. 2d at 844 (emphasis added). The Court also noted that an extension of the city's electric service, reasonable at the time prior cases were decided, "would not necessarily be reasonable in the present day under the circumstances disclosed in the record before us." In *Domestic Electric* this Court considered the fact that the territory was "assigned"; the nature of the potential provider (IOU, electric membership corporation or municipality), and the fact that the service and rates of IOUs are regulated by the North Carolina Utilities Commission; that the service (but not the rates) of electric membership corporations are similarly regulated and the fact that neither the rates nor the service of municipalities is regulated (except by municipal authorities); the distance of the potential customer from the corporate limits of the municipality; and customer choice. However, none of these considerations was determinative. The determinative factors considered by the Court in *Domestic Electric* were each electric provider's level of current service in the area in question and particularly in the immediate vicinity of the potential customer, and the readiness, willingess, and ability of each to serve the potential customer.

In applying the determinative factors of *Domestic Electric* to this appeal, we have already noted with regard to current service in the area and in particular in the immediate vicinity of the potential customer, that Fayetteville was serving 22 customers and the EMC 5 customers within a one-half mile radius of the subdivision entrance. Within a one mile radius of the same point Fayetteville was serving 229 customers and the EMC 75 customers. Fayetteville has had a three-phase line immediately adja-

cent to the subdivision proper since 1973, and on the date this action was filed such three-phase service was available directly across the street from the entrance to the subdivision tract. The EMC had only a single-phase line, within 170 feet of the entrance to the subdivision, and its nearest three-phase line was located approximately 1,850 feet from the nearest boundary of the subdivision and 3,174 feet from the entrance to the subdivision.

With regard to the readiness, willingness, and ability to serve factor, unquestionably both Fayetteville and the EMC had the desire or willingness and the financial and physical ability (not to be confused with readiness) to serve the potential customer. With regard to readiness, Fayetteville's three-phase service was immediately available whereas the EMC's three-phase service was 1,850 feet from the nearest boundary of the subdivision and 3,174 feet from the subdivision entrance and would have required five days construction time and an expenditure of $11,700 to make its three-phase service equally available. It cannot be said that the EMC was "ready" to furnish service.

With regard to these determinative factors, the able trial judge found, *inter alia*, as facts:

VII. That the development of Section I of the Montibello Subdivision requires a three-phase electrical power supply; that since approximately 1973 PWC has had a three-phase power line immediately adjacent to the Montibello Subdivision; that Lumbee has had only a single-phase source of power adjacent to said Subdivision; and that said single-phase source of power has been in existence since approximately 1948; and that the only three-phase power source Lumbee has had near the Montibello Subdivision is located approximately 1,850 feet from said Subdivision.

VIII. That on or about the time this action was commenced PWC provided electrical service to 22 and 229 customers within one-half and one mile radii, respectively, of the Montibello Subdivision; that Lumbee comparably served only 5 and 75 customers within the same respective areas; and that PWC presently has, and has had, a significant commitment in the distribution of electrical energy in the general area surrounding the Montibello Subdivision.

IX. That both PWC and Lumbee have the ability to provide and maintain adequate three-phase electrical power to Section I of the Montibello Subdivision; but that the providing of three-phase power by Lumbee to said Montibello Subdivision would duplicate a PWC three-phase power line previously existing and being located adjacent to said Subdivision.

Based upon these and his other findings of fact, the trial judge made, *inter alia*, the following conclusions of law:

V. That any extension by Lumbee of a three-phase electrical power line to the Montibello Subdivision would constitute an uneconomic duplication of PWC's previously existing three-phase electrical distribution system.

VI. That PWC may extend its electrical service outside its municipal boundaries; and that under the facts and circumstances herein presented, its extension of services to the Montibello Subdivision is 'within reasonable limitations' within the meaning of NCGS 160A-312.

We conclude that the trial judge's findings of fact were fully supported by the evidence and that those findings in turn fully support his conclusions of law.

When this matter was heard on the merits by Judge Braswell, he was sitting without a jury. At the close of plaintiffs' evidence, Fayetteville moved for a directed verdict and the trial court properly treated the motion as a motion for dismissal of the action pursuant to Rule 41(b) of our Rules of Civil Procedure on the ground that upon the facts presented by plaintiffs and the law, plaintiffs had shown no right to relief. The pertinent portion of Rule 41(b) is as follows:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of

all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this section . . . operates as an adjudication upon the merits.

G.S. § 1A-1, Rule 41(b).

[3] A Rule 41(b) motion challenges the sufficiency of plaintiff's evidence to establish plaintiff's right to relief. *See Pegram-West Inc. v. Hiatt Homes, Inc.,* 12 N.C. App. 519, 184 S.E. 2d 65 (1971). In a nonjury case, section (b) of this rule provides a procedure whereby, at the close of plaintiff's evidence, the judge can give judgment against plaintiff not only because his proof has failed in some essential aspect to make out a case but also on the basis of facts as he may then determine them to be from the evidence then before him. *O'Grady v. Bank,* 296 N.C. 212, 250 S.E. 2d 587 (1978); *Helms v. Rea,* 282 N.C. 610, 194 S.E. 2d 1 (1973). The trial judge sits as a trier of the facts and may weigh the evidence, find the facts against the plaintiff and sustain the defendant's motion under section (b) of this rule at the conclusion of the plaintiff's evidence, even though the plaintiff has made out a prima facie case which would have precluded a directed verdict for the defendant in a jury case. *Helms v. Rea,* 282 N.C. 610, 194 S.E. 2d 1; *Williams v. Liles,* 31 N.C. App. 345, 229 S.E. 2d 215 (1976); *Neasham v. Day,* 34 N.C. App. 53, 237 S.E. 2d 287 (1977); *Newsome v. Newsome,* 43 N.C. App. 580, 259 S.E. 2d 577 (1979); *see generally* Annot., 55 A.L.R. 3d 272 (1974).

The function of the trial judge as trier of the facts is to evaluate the evidence without any limitation as to inferences favorable to plaintiff. *Dealers Specialties, Inc. v. Housing Services,* 305 N.C. 633, 291 S.E. 2d 137 (1982). The findings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if, *arguendo,* there is evidence to the contrary. *See Ingram, Comr. of Insurance v. Insurance Agency,* 50 N.C. App. 510, 274 S.E. 2d 497, *modified and affirmed,* 303 N.C. 287, 278 S.E. 2d 248 (1981). The trial court's judgment therefore must be granted the same deference as a jury verdict. *Murray v. Murray,* 296 N.C. 405, 250 S.E. 2d 276 (1979).

Where, as here, the trial judge's findings are supported by the evidence and those findings in turn support his conclusions of

law, they are binding on appeal. We believe that the Court of Appeals' conclusion and its opinion is inconsistent with these principles. The Court of Appeals erred in reversing the trial court's judgment through a misunderstanding and misapplication of our decision and the law announced by this Court in *Domestic Electric*.

[4] We agree however with that portion of the opinion of the Court of Appeals which holds that the provision of the city charter of Fayetteville authorizing the city to extend its electric system and to sell electricity anywhere within Cumberland County (1979 Sess. Laws, ch. 557, § 6.19) must be construed together with the provision of G.S. § 160A-312 with the result that the City of Fayetteville Public Works Commission can only extend electric service outside its corporate limits "within reasonable limitations."

> A municipal corporation has only such powers as are granted to it by the General Assembly in its specific charter or by the general laws of the State applicable to all municipal corporations, and the powers granted in the charter will be construed together with those given under the general statutes.

*Riddle v. Ledbetter*, 216 N.C. 491, 492, 5 S.E. 2d 542, 543 (1939).

For the reasons hereinabove stated the decision of the Court of Appeals is reversed and the case is remanded to that court for reinstatement of the judgment of the trial court.

Reversed and remanded.