FANNIE LEE TILLMAN AND SHIRLEY RICHARDSON, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED v. COMMERCIAL CREDIT LOANS, INC.; COMMERCIAL CREDIT CORPORATION; CITIGROUP, INC.; CITICORP, INC.; CITIFINANCIAL, INC.; AND CITIFINANCIAL SERVICES, INC.

No. 360A06

(Filed 25 January 2008)

**Arbitration and Mediation— arbitration clause in standard loan contract—unconscionable**

In a majority decision that relied upon two Justices concurring in the result only, the Court of Appeals was reversed and the decision of the trial court to deny a motion to compel arbitration was upheld. Both majority opinions agreed that the arbitration clause in a standard loan contract was unconscionable.

Justice EDMONDS concurring in the result only.

Justice MARTIN joins in this concurring opinion.

Justice NEWBY dissenting.

Chief Justice PARKER joins in this dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 177 N.C. App. 568, 629 S.E.2d 865 (2006), reversing an order denying defendants' motion to compel arbitration entered on 20 January 2005 by Judge Ronald L. Stephens in Superior Court, Vance County, and remanding for entry of an order granting that motion. Heard in the Supreme Court 13 February 2007.

*Jones Martin Parris & Tessener Law Offices, P.L.L.C., by John Alan Jones and G. Christopher Olson, for plaintiff-appellants.*

*Moore & Van Allen, PLLC, by Jeffrey M. Young, and Rogers & Hardin LLP, by Richard H. Sinkfield and Christopher J. Willis, for defendant-appellees.*

*North Carolina Justice Center, by Carlene McNulty, for North Carolina Justice Center, Financial Protection Law Center, and Trial Lawyers for Public Justice, amici curiae.*

*Ellis & Winters LLP, by Wendy I. Sexton, for American Financial Services Association, Chamber of Commerce of the United States of America, and Consumer Bankers Association, amici curiae.*

TIMMONS-GOODSON, Justice.

The question chiefly presented is whether the arbitration clause contained in the loan agreements that serve as the basis for the instant case is unconscionable. Because the clause is one-sided, prohibits joinder of claims and class actions, and exposes claimants to prohibitively high costs, we hold that the trial court did not err in concluding as a matter of law that the clause is unconscionable.

## I. BACKGROUND

Plaintiffs Fannie Lee Tillman and Shirley Richardson ("plaintiffs") are North Carolina residents who obtained loans from defendant Commercial Credit Loans, Inc. (n/k/a CitiFinancial Services, Inc.). On 22 September 1998, Fannie Lee Tillman obtained a loan for a term of 120 months with a principal amount of $18,253.68. In connection with the loan, Commercial Credit sold Mrs. Tillman single premium credit life and disability insurance with premiums of $1,058.80 and $1,005.95, respectively. On 4 June 1999, Shirley Richardson obtained a loan for a term of 180 months with a principal amount of $20,935.57. In connection with the loan, Commercial Credit sold Mrs. Richardson single premium credit life, disability, and involuntary unemployment insurance with premiums of $1,871.54, $1,109.49, and $1,227.72, respectively. Plaintiffs' loan principal amounts included their insurance premiums, which were financed over the life of the loan.

Credit life insurance pays off a borrower's loan if the borrower dies; credit disability pays off the loan if the borrower becomes disabled; and credit involuntary unemployment pays the loan if the borrower becomes involuntarily unemployed. The insurance is referred to as single premium because "the borrower is charged the entire insurance premium at the time the underlying loan is originated, with the premium being financed into and over the life of the loan." In July 1999 the North Carolina General Assembly outlawed single premium credit insurance for loans made or entered into on or after 1 July 2000. Act of July 15, 1999, ch. 332, sec. 5, 1999 N.C. Sess. Laws 1202, 1216 (codified at N.C.G.S. § 24-10.2(b) (2005)).

It is undisputed that both plaintiffs have limited financial resources. Mrs. Tillman's weekly after-tax take-home pay is approximately $258.00. Her husband is deceased, and as a result, Mrs. Tillman also receives $285.60 per month in pension benefits and $1063.00 per month in Social Security benefits. Mrs. Richardson works two jobs where she earns $12.70 per hour and $12.00 per hour. For both plaintiffs, their home is their most significant asset.

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

Plaintiffs' loan agreements contained the standard arbitration clauses that defendants have included in their loan agreements since 12 February 1996. The arbitration clause was drafted by defendants, and plaintiffs were given no opportunity to negotiate regarding the clause. The clause contains the following relevant provisions:

> **Agreement to Arbitrate Claims.** Upon written request by either party that is submitted according to the applicable rules for arbitration, any Claim, except those specified below in this Provision, shall be resolved by binding arbitration in accordance with (i) the Federal Arbitration Act; (ii) the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association ("Administrator"); and (iii) this Provision, unless we both agree in writing to forgo arbitration. The terms of this Provision shall control any inconsistency between the rules of the Administrator and this Provision. . . .
>
> . . . .
>
> **Claims Excluded from Arbitration.** The following types of matters will not be arbitrated. This means that neither one of us can require the other to arbitrate:
>
> - Any action to effect a foreclosure to transfer title to the property being foreclosed; or
>
> - Any matter where all parties seek monetary damages in the aggregate of $15,000.00 or less in total damages (compensatory and punitive), costs, and fees.
>
> . . . .
>
> Appeal. Either You or We may appeal the arbitrator's award to a three-arbitrator panel selected through the Administrator, which shall reconsider de novo any aspect of the initial award requested by the appealing party. The expedited procedures of the Administrator shall not govern any appeal. An appeal will be governed by Rule 23 of the Comprehensive Arbitration Rules and Procedures of J*A*M*S/Endispute, Inc.
>
> . . . .
>
> No Class Actions/No Joinder of Parties. You agree that any arbitration proceeding will only consider Your Claims. Claims by or on behalf of other borrowers will not be arbitrated in any proceeding that is considering Your Claims. Similarly,

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

You may not join with other borrowers to bring claims in the same arbitration proceeding, unless all of the borrowers are parties to the same Credit Transaction.

. . . .

Costs. The cost of any arbitration proceeding shall be divided as follows:

- The party making demand upon the Administrator for arbitration shall pay $125.00 to the Administrator when the demand is made.

- We will pay to the Administrator all other costs for the arbitration proceeding up to a maximum of one day (eight hours) of hearings.

- All costs of the arbitration proceeding that exceed one day of hearing will be paid by the non-prevailing party.

- In the case of an appeal, the appealing party will pay any costs of initiating an appeal. The non-prevailing party shall pay all costs, fees, and expenses of the appeal proceeding and, if applicable, shall reimburse the prevailing party for the cost of filing an appeal.

- Each party shall pay his/her own attorney, expert, and witness fees and expenses, unless otherwise required by law.

. . . .

Severability. If the arbitrator or any court determines that one or more terms of this Provision or the arbitration rules are unenforceable, such determination shall not impair or affect the enforceability of the other provisions of this Agreement or the arbitration rules.

In June 2002 plaintiffs commenced this suit[1] against defendants Commercial Credit Loans, Inc., Commercial Credit Corporation, Citigroup, Inc., CitiFinancial, Inc., CitiFinancial Services, Inc., and Citicorp, Inc.,[2] asserting claims for violations of North Carolina's

---

1. Plaintiffs filed this suit as a class action, but the record contains no indication that the trial court certified the class.

2. Commercial Credit Corp., Citigroup, Inc., CitiFinancial, Inc., and Citicorp, Inc. are corporate parents or affiliates of Commercial Credit Loans, Inc. (n/k/a CitiFinancial Services, Inc.). While Commercial Credit Corp., Citigroup, Inc., CitiFinancial, Inc., and Citicorp, Inc. remain as defendants in the underlying case,

## TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, unjust enrichment, and breach of the duties of good faith and fair dealing. The claims rest on plaintiffs' contention that they did not want or need single premium credit insurance and that Commercial Credit did not tell them that the insurance was optional. In addition, plaintiffs claim that Commercial Credit was the sole beneficiary of the insurance policies. Plaintiffs' complaint specifically alleges that "Commercial Credit violated North Carolina law by failing to provide Plaintiffs with requisite disclosures regarding the credit insurance sold to them and by charging fees that were deceptive, unfair, duplicative, imposed without adequate commercial justification or disclosure, and in excess of the fees permitted by North Carolina law." Plaintiffs seek money damages based on the amount of credit insurance premiums collected by defendants.

Beginning in May 2003, defendants filed a series of motions to compel arbitration pursuant to the arbitration clause contained in plaintiffs' loan agreements. In an order entered on 20 January 2005, the trial court denied defendants' motion to compel arbitration dated 17 June 2004. The order included the following findings of fact:

9. The Commercial Credit arbitration clause is a standard-form contract of adhesion. The borrower is given no opportunity to negotiate out of the arbitration provision, and CitiFinancial Services, Inc. would not make a loan if the loan agreement did not include the arbitration provision. The loan documents, including the arbitration provision at issue, were drafted by Defendant.

10. Since the time CitiFinancial Services, Inc. began including an arbitration clause in its loan agreements, the lender has made more than 68,000 loans in North Carolina. During that time, CitiFinancial Services has pursued lawsuits in civil court against more than 3,700 borrowers in North Carolina, including over 2,000 collection actions and more than 1,700 foreclosure actions. Defendant has been able to pursue claims in civil court by virtue of two exceptions within the arbitration clause, which Defendant drafted, for (1) foreclosure actions and (2) matters in which less than $15,000.00 in damages, including costs and fees, are sought. The average amount in dispute in matters in which CitiFinancial

for purposes of the issue on appeal before this Court, the term "defendants" will refer only to Commercial Credit Loans, Inc. (n/k/a CitiFinancial Services, Inc.) and CitiFinancial, Inc.

Services, Inc. pursued legal action against North Carolina borrowers is under $7,000.00.

11. Since the time CitiFinancial Services, Inc. began including an arbitration provision in its loan agreements, there have been no arbitration proceedings in North Carolina involving Citi-Financial Services, Inc. and any of its borrowers. Since introduction of the arbitration clause, no North Carolina borrower has requested arbitration of any dispute with CitiFinancial Services, Inc., nor has CitiFinancial Services, Inc. demanded arbitration of any dispute involving any North Carolina borrower. The only legal redress sought has been the collection and foreclosure actions pursued in civil court by Defendant against its borrowers.

12. The only persons present at the loan closings involving Plaintiffs Tillman and Richardson were Plaintiffs and a Commercial Credit loan officer. [Mrs.] Tillman and [Mrs.] Richardson were rushed through the loan closings, and the Commercial Credit loan officer indicated where [Mrs.] Tillman and [Mrs.] Richardson were to sign or initial the loan documents. There was no mention of credit insurance or the arbitration clause at the loan closings.

13. The compensation rates for American Arbitration Association ("AAA") arbitrators in North Carolina range from $500.00 to $2,380.00 per day. The average daily rate of AAA arbitrator compensation in North Carolina is $1,225.00.

14. Plaintiffs Fannie Lee Tillman and Shirley Richardson entered into contingency fee contracts with the attorneys representing them. The contingency fee contract is typical of such agreements. The contingency fee agreement entered into by Plaintiffs provides that their attorneys will not be entitled to any fee unless there is some monetary recovery obtained on behalf of Plaintiffs, either by way of settlement or verdict. The agreement further provides that the law firm representing Plaintiffs shall advance the costs and expenses incurred in prosecuting the action.

15. Based upon the 1998 North Carolina Bar Association Economic Survey, the most recent survey published, the average hourly rate for attorneys working on litigation matters such as this is between $150.00-$250.00 per hour.

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

16. Based upon the limited financial resources of Plaintiffs and other similarly situated borrowers, they could not afford to hire an attorney to be paid on an hourly basis. The only realistic means by which persons in the position of Plaintiffs can prosecute their claims is by entering into a contingency fee agreement with lawyers willing to advance the costs and expenses of the litigation and with the law firm assuming the risk that there might be no recovery.

17. Plaintiffs asserted claims for relief under Chapter 75 of the North Carolina General Statutes, contending that Defendant['s] sale of single-premium credit insurance in connection with real estate loans constituted an unfair or deceptive trade practice or act in or affecting commerce. Plaintiffs seek damages based upon the amount of premiums charged for those credit insurance products. In most cases, the premium charges for single-premium credit insurance sold by CitiFinancial Services, Inc. were under $5,000.00 per loan. Plaintiff Fannie Lee Tillman was charged $2,064.75 in single-premium credit insurance premiums in connection with her September 22, 1998 loan; Plaintiff Shirley Richardson was charged $4,208.75 for single-premium credit insurance with her June 4, 1999 loan. The relatively modest damages claimed by Plaintiffs make it unlikely that any attorneys would be willing to accept the risks attendant to pursuing claims against one of the nation's largest lenders, even with the prospect of a treble damages award and statutory attorney's fees. It would not be feasible to prosecute the claims of the named Plaintiffs and of putative class members on an individual basis.

18. Defendant's arbitration clause contains features which would deter many consumers from seeking to vindicate their rights. These features include the cost-shifting ("loser pays") provision with respect to the initial arbitration proceeding to the extent it exceeds eight hours, the cost-shifting provision associated with the de novo appeal from that initial arbitration proceeding, and the prohibition on joinder of claims and class actions. The prohibition on class actions and the cap of $15,000.00 on the value of claims that can be pursued outside of the arbitration process designed by Defendant make[] it unlikely that borrowers would be able to retain lawyers willing to pursue litigation against a large commercial entity, such as CitiFinancial Services, Inc.

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

19. To successfully prosecute a complex case, including a class action such as this one, a law firm would likely need the assistance of expert witnesses. The hourly fees of experts in the fields of economics, lending practices, and credit insurance can range from $150.00 to $300.00 per hour, plus expenses. In complex cases, litigation costs and expenses, including deposition costs, travel expenses, and expert witness fees, can easily run into thousands of dollars. The class action mechanism allows persons with relatively small claims to pool their resources and have those litigation expenses and costs shared among all class members. The class action device provides a means by which consumers with modest damages claims can obtain representation by competent counsel with sufficient resources to afford protracted litigation in complex cases.

Ultimately, the trial court denied the motion to compel arbitration based on its conclusion that the arbitration clause contained in plaintiffs' loan agreements is unconscionable and unenforceable

due to the prohibitively high arbitration costs borrowers might face in pursuing claims through arbitration, the fee-shifting ("loser pays") provisions which expose borrowers to excessive arbitration and appeal costs . . . , and because the arbitration clause is excessively one-sided and lacks mutuality in that it preserves access to the courts for the lender while prohibiting joinder of claims and class actions on the part of borrowers and restricts what claims of borrowers can be pursued in civil court.

Defendants appealed, and a divided panel of the Court of Appeals reversed the trial court's order and remanded to the trial court for entry of an order granting defendants' motion to compel arbitration. *Tillman v. Commercial Credit Loans, Inc.*, 177 N.C. App. 568, 629 S.E.2d 865 (2006). The COA majority held that the provisions of the arbitration agreement, "[v]iewed separately or together," do not render it unconscionable. *Id.* at 582, 629 S.E.2d at 875. The dissenting opinion concluded that the trial court's unconscionability finding was supported by the evidence and by North Carolina law, *id.* at 595, 629 S.E.2d at 883 (Hunter, J., dissenting), and plaintiffs filed an appeal of right as to that issue.

## II. ANALYSIS

The standard governing our review of this case is that "findings of fact made by the trial judge are conclusive on appeal if supported

by competent evidence, even if . . . there is evidence to the contrary." *Lumbee River Elec. Membership Corp. v. City of Fayetteville*, 309 N.C. 726, 741, 309 S.E.2d 209, 219 (1983) (citation omitted). "Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004). Because unconscionability is a question of law, this Court will review *de novo* the trial court's conclusion that the arbitration agreement contained in plaintiffs' loan agreements is unconscionable. *See Rite Color Chem. Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 21, 411 S.E.2d 645, 649 (1992) (citations omitted); 17A Am. Jur. 2d *Contracts* § 327 (2004); John N. Hutson, Jr. & Scott A. Miskimon, *North Carolina Contract Law* § 9-14, at 556 (2001).

In the instant case, many of the trial court's findings are uncontested. Furthermore, after extensive review of the record, we conclude that the eight findings of fact contested by defendant are supported by competent evidence. We review several of the contested findings here. While defendants assign error to finding of fact number sixteen, *supra*, both plaintiffs testified they could not afford to hire an attorney to be paid on an hourly basis. In addition, contested finding of fact number nine, *supra*, is clearly supported by the deposition of Debra Hovatter, CitiFinancial's General Counsel for Litigation, who testified that "[t]he company does not make loans without an arbitration provision." Contested finding of fact number thirteen, *supra*, is supported by the affidavit of AAA Assistant Vice President Gerald Strathmann, who testified regarding the average compensation rates for AAA arbitrators in North Carolina. Based on our review of the record, the trial court's findings of fact are supported by competent evidence and are therefore conclusive.

We now review the trial court's conclusions of law *de novo*. Arbitration is favored in North Carolina. *Cyclone Roofing Co. v. David M. LaFave Co.*, 312 N.C. 224, 229, 321 S.E.2d 872, 876 (1984). As with any contract, however, "equity may require invalidation of an arbitration agreement that is unconscionable." *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002). A court will find a contract to be unconscionable

> only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.

*Brenner v. Little Red Sch. House Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981) (citations omitted). An inquiry into unconscionability requires that a court "consider all the facts and circumstances of a particular case," and "[i]f the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." *Id.*

The Court of Appeals has held that unconscionability is an affirmative defense, and the party asserting it has the burden of proof. *Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 649. We agree. In the instant case, plaintiffs argue that defendants, because they are seeking to compel arbitration, have the burden of showing that the parties agreed to the arbitration provision. In support of this argument, plaintiffs rely on *King v. Owen*, 166 N.C. App. 246, 248, 601 S.E.2d 326, 237 (2004); *Milon v. Duke University*, 145 N.C. App. 609, 617, 551 S.E.2d 561, 566 (2001), *rev'd per curiam*, 355 N.C. 263, 559 S.E.2d 789, *cert. dismissed*, 536 U.S. 979 (2002); and *Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268, 272, 423 S.E.2d 791, 794 (1992), but the instant case is distinguishable. Each of those cases involved a dispute about whether an arbitration agreement had been properly executed. Here, there is no question that plaintiffs signed the agreement. Rather, the question is whether the agreement is unconscionable.

A party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability. *See Martin v. Sheffer*, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991); *see also* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 4-7, at 315 (5th ed. 2006) [hereinafter White & Summers] ("Most courts take a 'balancing approach' to the unconscionability question, and . . . seem to require a certain quantum of procedural, plus a certain quantum of substantive, unconscionability."). While this Court has never explicitly adopted this framework, we conclude that it is supported by the Court's case law and adopt it here. In *Brenner*, for example, this Court determined that a contract between a parent and a private school was not unconscionable. 302 N.C. at 214, 274 S.E.2d at 211. The Court so held after considering whether there was inequality of bargaining power between the parties, whether plaintiff was "forced to accept defendant's terms," and whether the contract itself "was one that a reasonable person of sound judgment might accept." *Id.* at 213-14, 274 S.E.2d at 211. Thus, the Court considered both the procedural and substantive aspects of the contract at issue.

According to *Rite Color Chemical Co.*, procedural unconscionability involves "bargaining naughtiness" in the form of unfair sur-

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

prise, lack of meaningful choice, and an inequality of bargaining power. 105 N.C. App. at 20, 411 S.E.2d at 648. Substantive unconscionability, on the other hand, refers to harsh, one-sided, and oppressive contract terms. *Id.* at 20, 411 S.E.2d at 648-49. Of course, unconscionability is ultimately "a determination to be made in light of a variety of factors not unifiable into a formula." White & Summers, § 4-3, at 296 (emphasis omitted). Therefore, we note that while the presence of both procedural and substantive problems is necessary for an ultimate finding of unconscionability, such a finding may be appropriate when a contract presents pronounced substantive unfairness and a minimal degree of procedural unfairness, or vice versa. *See Tacoma Boatbuilding Co. v. Delta Fishing Co.*, 28 U.C.C. Rep. Serv. (CBC) 26, 37 n.20 (W.D. Wash. 1980) ("[T]he substantive/procedural analysis is more of a sliding scale than a true dichotomy. The harsher the clause, the less 'bargaining naughtiness' that is required to establish unconscionability.").

We conclude that, taken together, the oppressive and one-sided substantive provisions of the arbitration clause at issue in the instant case and the inequality of bargaining power between the parties render the arbitration clause in plaintiffs' loan agreements unconscionable.

## A. PROCEDURAL UNCONSCIONABILITY

In the instant case, the trial court did not explicitly conclude that the facts supported a finding of procedural unconscionability. We note, however, that the trial court made the following finding of fact, which is supported by evidence in the record: "[Mrs.] Tillman and [Mrs.] Richardson were rushed through the loan closings, and the Commercial Credit loan officer indicated where [Mrs.] Tillman and [Mrs.] Richardson were to sign or initial the loan documents. There was no mention of credit insurance or the arbitration clause at the loan closings." In addition, defendants admit that they would have refused to make a loan to plaintiffs rather than negotiate with them over the terms of the arbitration agreement. Finally, the bargaining power between defendants and plaintiffs was unquestionably unequal in that plaintiffs are relatively unsophisticated consumers contracting with corporate defendants who drafted the arbitration clause and included it as boilerplate language in all of their loan agreements. We therefore conclude that plaintiffs made a sufficient showing to establish procedural unconscionability.

## B. SUBSTANTIVE UNCONSCIONABILITY

The trial court found the arbitration clause to be substantively unconscionable because (1) the arbitration costs borrowers may face are "prohibitively high"; (2) "the arbitration clause is excessively one-sided and lacks mutuality"; and (3) the clause prohibits joinder of claims and class actions. We agree that here, the collective effect of the arbitration provisions is that plaintiffs are precluded from "effectively vindicating [their] . . . rights in the arbitral forum." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000).

In *Green Tree*, the United States Supreme Court recognized that "the existence of large arbitration costs" could serve as the basis for holding an arbitration clause to be unenforceable. *Id.* The Court ultimately held that the plaintiff in that case had not sufficiently demonstrated "the likelihood of incurring such costs" because the arbitration clause in question did not specify who would bear the costs of arbitration. 531 U.S. at 91-92. The Court disregarded evidence presented by the plaintiff about the average arbitral fees of the American Arbitration Association ("AAA") because there was no factual showing that AAA would be conducting the arbitration or that the plaintiff would be required to pay the fees. *Id.* at 90 n.6.

Similarly, the Fourth Circuit has held that any inquiry into arbitration costs must be "a case-by-case analysis that focuses . . . upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001). In *Bradford*, the court found that costs were not prohibitive because the plaintiff "offered no evidence that he was unable to pay the $4,470.88 [fee], or that the fee-splitting provision deterred him from pursuing his statutory claim or would have deterred others similarly situated." *Id.* at 558. Indeed, the court noted that the plaintiff's base salary at the time of the actions which led him to instigate the lawsuit in question was $115,000 per year. *Id.* at 558 n.6.

The instant case is distinguishable. In terms of ability to pay, the evidence of plaintiffs' limited financial means is uncontested. Plaintiffs live paycheck to paycheck and usually have very little money left in their bank accounts after paying their monthly bills. The arbitration clause specifies that AAA will administer any arbitration between the parties to the loan agreement, and evidence in the

record indicates that the average daily rate of AAA arbitrator compensation in North Carolina is $1,225.00. According to the arbitration clause, when an arbitration lasts more than eight hours, the loser will be charged with costs. Moreover, the clause provides for a *de novo* appeal before a panel of three arbitrators, and again, the loser pays the costs. For example, at the average rate, a two-day appeal would cost the losing party $7,350.00 in arbitrator fees. Plaintiffs simply do not have the resources to risk facing these kinds of fees. *See Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or. App. 553, 574, 152 P.3d 940, 952 (2007) (concluding that a cost-sharing provision in an arbitration clause was "sufficiently onerous to act as a deterrent to [the] plaintiffs' vindication of their claim").

*Bradford* also rightly notes that the cost of arbitration must be compared with the cost of litigation. *Id.* at 556. As demonstrated above, paying for arbitrators is a significant cost that is simply not faced in filing a lawsuit in court. *See Vasquez-Lopez*, 210 Or. App. at 574, 152 P.3d at 952 ("regardless of whether filing fees are relatively equal in court and arbitration, the fact remains that most of the cost involved in an arbitration will be the arbitrator's fees; in court, by contrast, neither party has to pay for the judge"). The trial court also found that

> [t]he only realistic means by which persons in the position of Plaintiffs can prosecute their claims is by entering into a contingency fee agreement with lawyers willing to advance the costs and expenses of the litigation and with the law firm assuming the risk that there might be no recovery.

Because plaintiffs' damage amounts are so low (under $4,500 each), the trial court found that it is "unlikely that any attorneys would be willing to accept the risks attendant to pursuing [these] claims." The likelihood that an attorney would take a case controlled by the arbitration clause at issue here is even less because the arbitration clause prohibits the joinder of claims and class actions. Therefore, neither attorneys nor plaintiffs are able to share the risks attendant to pursuing this litigation.

*Bradford* finally instructs that in order to find unenforceability due to excessive costs, the cost differential between litigation and arbitration must be so great that it deters individuals from bringing claims under the arbitration clause. *Id.* at 556. Evidence in the record indicates that no arbitrations have been brought under the clause that defendant has included in over 68,000 loan agreements

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

in North Carolina. Based on this evidence and the above analysis, it appears that the combination of the loser pays provision, the *de novo* appeal process, and the prohibition on joinder of claims and class actions creates a barrier to pursuing arbitration that is substantially greater than that present in the context of litigation. We agree with the trial court that "[d]efendant's arbitration clause contains features which would deter many consumers from seeking to vindicate their rights."

Defendants argue that the costs analysis is irrelevant because the terms of the arbitration agreement have been superceded by AAA's Consumer Rules, which became effective on 1 March 2002. More specifically, defendants state that they are "willing to arbitrate [plaintiffs'] claims under [these rules]." This argument is unpersuasive. First, the arbitration clause itself provides that "[t]he terms of this Provision shall control any inconsistency between the rules of the [AAA] and this Provision." Second, this Court, the Fourth Circuit, and other courts have held that it is inappropriate to rewrite an illegal or unconscionable contract. *See Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 676 (6th Cir. 2003) ("In considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs where the agreement itself provides that the plaintiff is liable, at least potentially, for arbitration fees and costs."); *Murray*, 289 F.3d at 304 ("The arbitration agreement is unenforceable as written and [the union] may not rewrite the arbitration clause and adhere to unwritten standards on a case-by-case basis in order to claim that it is an acceptable one."); *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 13-14, 857 N.E.2d 250, 259 (2006) ("[A] defendant's after-the-fact offer to pay the costs of arbitration should not be allowed to preclude consideration of whether the original arbitration clause is unconscionable."); *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989) ("The courts will not rewrite a contract if it is too broad but will simply not enforce it."). We agree with the Sixth Circuit's observation that because the underlying concern is whether individuals, upon reading an arbitration agreement, will be deterred from bringing a claim, courts must consider the agreement as drafted. *See Morrison*, 317 F.3d at 676-77.

The second concern plaintiffs raise is the one-sidedness of the arbitration clause contained in their loan agreements. In *Brenner*, this Court held that when "the provisions [of a contract] are . . .

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." 302 N.C. at 213, 274 S.E.2d at 210.

In the instant case, the clause excepts from arbitration foreclosure actions and actions in which the total damages, costs, and fees do not exceed $15,000. Plaintiffs argue that the arbitration clause preserves defendants' ability to pursue its claims in court while denying plaintiffs that same option. Evidence in the record indicates that since 1996, defendants have brought over 2,000 collection actions with an average "payoff" of under $7,000. In addition, it appears that defendants have not initiated arbitration in North Carolina. In other words, every time defendants have taken legal action against a borrower, they have managed to avoid application of the arbitration clause. This arbitration clause is not as egregious as some that specifically carve out an exception for the corporate drafter of the clause to pursue collection actions in court. *See, e.g., Arnold v. United Cos. Lending Corp.*, 204 W. Va. 229, 233, 235-37, 511 S.E.2d 854, 858, 860-62 (1998). Practically speaking, however, the exceptions appear to be designed far more for the benefit of defendants than for plaintiffs. The one-sidedness of the clause therefore contributes to our overall conclusion that it is unconscionable.

Plaintiffs finally argue that the arbitration clause is unconscionable because it prohibits joinder of claims and class actions. Plaintiffs correctly note that an increasing number of courts have found class action waivers in arbitration clauses substantively unconscionable. *See, e.g., Scott v. Cingular Wireless*, 160 Wn.2d 843, 850-51, 161 P.3d 1000, 1004 (2007) (citing such cases from sixteen jurisdictions). Taken alone, such a prohibition may be insufficient to render an arbitration agreement unenforceable, *see, e.g., Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002), but *Brenner* instructs that an unconscionability analysis must consider all of the facts and circumstances of a particular case, 302 N.C. at 213, 274 S.E.2d at 211. Therefore, the trial court correctly concluded that a prohibition on joinder of claims and class actions "is a factor to be considered in determining whether an arbitration provision is unconscionable." *Accord Kristian v. Comcast Corp.*, 446 F.3d 25, 53-61 (1st Cir. 2006); *Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir. 2003); *cert. denied*, 540 U.S. 811 (2003); *Leonard v. Terminix Int'l Co.*, 854 So. 2d 529, *passim* (Ala. 2002) (per curiam); *State ex rel. Dunlap v. Berger*, 211 W. Va. 549, 562-64, 567 S.E.2d 265, 278-80, *cert. denied*, 537 U.S. 1087 (2002).

In the instant case, the prohibition on joinder of claims and class actions affects the unconscionability analysis in two specific ways. First, the prohibition contributes to the financial inaccessibility of the arbitral forum as established by this arbitration clause because it deters potential plaintiffs from bringing and attorneys from taking cases with low damage amounts in the face of large costs that cannot be shared with other plaintiffs. Second, the prohibition contributes to the one-sidedness of the clause because the right to join claims and pursue class actions would benefit only borrowers. *See, e.g., Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1101, 118 Cal. Rptr. 2d 862, 867 (2002), *cert. denied*, 537 U.S. 1226 (2003); *Vasquez-Lopez*, 210 Or. App. at 569, 152 P.3d at 949-50 (quoting Anatole France's observation in *The Red Lily* that " 'the majestic equality of the laws forbid[s] rich and poor alike to sleep under the bridges, to beg in the streets, and to steal their bread' " and noting that "[a]lthough the arbitration rider with majestic equality forbids lenders as well as borrowers from bringing class actions, the likelihood of the lender seeking to do so against its own customers is as likely as the rich seeking to sleep under bridges.").

In conclusion, we hold that the provisions of the arbitration clause, taken together, render it substantively unconscionable because the provisions do not provide plaintiffs with a forum in which they can effectively vindicate their rights. *See Green Tree*, 531 U.S. at 90.

At oral argument, defendants asserted that any provisions of the arbitration clause found to be unconscionable could be stricken because the clause includes a severability provision. Severing the unenforceable provisions of the arbitration clause at issue in the instant case would require the Court to rewrite the entire clause, and we decline to do so here.

Ultimately, based on the facts and circumstances of this case, we hold that the arbitration clause in plaintiffs' loan agreements is unconscionable and therefore unenforceable. The inequality of bargaining power between the parties and the oppressive and one-sided nature of the clause itself lead us to this conclusion. Through the arbitration clause at issue in this case, defendants have not only unilaterally chosen the forum in which they want to resolve disputes, but they have also severely limited plaintiffs' access to the forum of their choice. Defendants argue that finding this clause to be unconscionable would be "hostile to arbitration." We disagree but at the same time reaffirm this Court's previous statements acknowledg-

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

ing the State's strong public policy favoring arbitration. However, this particular arbitration clause simply does not allow for meaningful redress of grievances and therefore, under *Green Tree*, must be held unenforceable.

For the foregoing reasons, the Court of Appeals decision reversing the trial court's order denying defendants' motion to compel is reversed.

REVERSED.

Justice EDMUNDS concurring in the result only.

I concur in the result only and agree that the trial court properly denied defendants' motion to compel arbitration. I write separately because I believe that this Court should apply the totality of the circumstances test set out in *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 274 S.E.2d 206 (1981).

In *Brenner*, we considered whether a contract between a noncustodial parent and a private school was unconscionable. *Id.* at 213-14, 274 S.E.2d at 210-11. The contract required the school to enroll the plaintiff's son during the upcoming school year in exchange for payment of a confirmation fee and tuition. *Id.* at 208-09, 274 S.E.2d at 208. The contract further provided that tuition was "payable in advance on the first day of school, no portion refundable." *Id.* at 208, 274 S.E.2d at 208. The plaintiff paid the confirmation fee and tuition as required, but the child's custodial parent refused to allow the child to attend the school. *Id.* at 208-09, 274 S.E.2d at 208. When the defendant denied the plaintiff's subsequent request for a refund, the plaintiff filed suit in district court alleging, in part, unconscionability of the contract. *Id.* at 209, 274 S.E.2d at 208. The trial court granted summary judgment for the plaintiff. *Id.*

On review, we explained that "a court must consider all the facts and circumstances of a particular case" to "determin[e] whether a contract is unconscionable." *Id.* at 213, 274 S.E.2d at 210. If the court, after examining the totality of the circumstances, determines that "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense" and that "the terms are so oppressive that no reasonable person would make them on the one hand" or "accept them on the other," then the court may "refuse to enforce [a] contract on the ground of unconscionability." *Id.* Circumstances this Court considered in *Brenner* included equality of bargaining power,

availability of other schools, and reasonableness of the disputed term. *Id.* at 213-14, 274 S.E.2d at 211. We found that "[t]he bargain was one that a reasonable person of sound judgment might accept" and concluded that the contract was "enforceable as written." *Id.* at 214, 274 S.E.2d at 211.

Applying *Brenner* here, I am persuaded that the facts and circumstances found by the trial court establish that the arbitration clause is unconscionable. Particularly compelling circumstances include the cost-shifting ("loser pays") provision for arbitration proceedings exceeding eight hours, the cost-shifting provision for de novo appeal from the initial arbitration, the prohibitions against joinder of claims and class actions, the $15,000.00 cap on the value of claims that can be pursued outside of arbitration, and the exclusion of foreclosure claims from arbitration. The cost-shifting provisions are particularly onerous because the trial court found that "compensation rates for American Arbitration Association ("AAA") arbitrators in North Carolina range from $500.00 to $2,380.00 per day," that "[t]he average daily rate of AAA arbitrator compensation in North Carolina is $1,225.00," that "the average hourly rate for attorneys working on litigation matters such as this is between $150.00-$250.00 per hour," and that "[t]o successfully prosecute a complex case . . . such as this one[] a law firm would likely need the assistance of expert witnesses. . . . in the fields of economics, lending practices, and credit insurance" whose rates "can range from $150.00 to $300.00 per hour, plus expenses."

Taken together, these circumstances effectively prevented plaintiffs from vindicating their rights under the contract in any forum. At the same time, the exclusionary clause allows defendants to pursue claims against borrowers in superior court. Perhaps the lopsided effect of the arbitration clause is best demonstrated by defendant CitiFinancial Services, Inc.'s (CitiFinancial) 68,000-to-0 record. Since it began including this arbitration clause in its loan agreements, CitiFinancial has made more than 68,000 loans in North Carolina. While no North Carolina borrower has ever requested arbitration of any dispute with CitiFinancial, CitiFinancial has pursued lawsuits in civil court against more than 3,700 borrowers in North Carolina, including more than 2,000 collection actions and 1,700 foreclosures. CitiFinancial has never requested arbitration of any dispute involving a North Carolina borrower.

Based on the preceding circumstances found by the trial court, I would hold that the inequality of the bargain represented by the arbi-

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

tration clause is so manifest as to shock the judgment of a person of common sense, and that the term is so oppressive that no reasonable person would offer it on the one hand or accept it on the other.

This Court has long held that "findings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if . . . there is evidence to the contrary." *Lumbee River Elec. Membership Corp. v. City of Fayetteville*, 309 N.C. 726, 741, 309 S.E.2d 209, 219 (1983); *see also Cardwell v. Cardwell,* 64 N.C. 528, 528, 64 N.C. 621, 622 (1870) ("We can no more review the finding of a Judge when it is his province to find facts than we can review the finding of a jury."). The form or manner in which a trial court receives evidence has never controlled the standard of review an appellate court applies to the trial court's findings of fact. *See, e.g., State v. Elliott*, 360 N.C. 400, 417, 628 S.E.2d 735, 747 (applying a deferential standard to the trial court's findings of fact when those findings were based upon a newspaper article), *cert. denied,* —— U.S. ——, 166 L. Ed. 2d 378 (2006); *Stephenson v. Bartlett*, 357 N.C. 301, 309, 582 S.E.2d 247, 252 (2003) (applying a deferential standard of review to the trial court's findings of fact when those findings were based upon written redistricting plans); *Homebuilders Ass'n of Charlotte, Inc. v. City of Charlotte*, 336 N.C. 37, 47, 442 S.E.2d 45, 52 (1994) (applying a deferential standard of review to the trial court's findings of fact when those findings were based upon uncontradicted affidavits).

We should not hasten to abandon century-old precedent applying a deferential standard of review to a trial court's findings of fact, especially when the issue has not been raised, briefed, or argued by any party.

For the reasons stated above, I concur in the result only.

Justice MARTIN joins in this separate opinion.

Justice NEWBY dissenting.

I recognize that subprime lenders are under close scrutiny and that our General Assembly decided to outlaw the sale of single premium insurance some time after the execution of the contracts at issue. This case, however, is not about regulating subprime loans. Instead, the Court's decision today implicates bedrock principles of contract law which should not be disturbed in response to policy concerns over a disfavored industry. For the first time in our

history, a North Carolina appellate court has found a contract to be unconscionable.

Although the majority[3] ostensibly applies general principles of state contract law to render this arbitration agreement unconscionable, in effect the majority finds it unconscionable precisely because it is an agreement to arbitrate. By holding that the collective effect of provisions unique to arbitration agreements renders the instant agreement unconscionable, the majority treats this contract differently from other contracts. Such an approach is precluded by federal law. *See* 9 U.S.C. § 2 (2000) (making arbitration agreements "valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of *any contract*." (emphasis added)); *Perry v. Thomas*, 482 U.S. 483, 493 n.9, 107 S. Ct. 2520, 2527 n.9, 96 L. Ed. 2d 426, 437 n.9 (1987) ("Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot."); *Gay v. CreditInform*, —— F.3d ——, ——, 2007 WL 4410362, at *21 (3d Cir. Dec. 19, 2007) (No. 06-4036) (rejecting a plaintiff's challenge to an arbitration agreement in which she "relie[d] on the uniqueness of the arbitration provision in framing her unconscionability argument" and "contende[d] that the provision is unconscionable because of what it provides, i.e., arbitration of disputes on an individual basis in place of litigation possibly brought on a class action basis").

Because I believe that today's holding is neither compelled by the facts under our state law nor complies with federal law, I respectfully dissent.

## I. FEDERAL LAW

The contract in this case provides for a means of alternative dispute resolution, arbitration, which is favored in North Carolina. *See, e.g., Cyclone Roofing Co. v. David M. LaFave Co.*, 312 N.C. 224, 229, 321 S.E.2d 872, 876 (1984). Our state's policy is consistent with "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765, 785 (1983). The Federal Arbitration Act ("FAA") makes all arbitration agreements "valid, irrevocable, and enforceable,

---

3. The "majority" refers to those members of this Court embracing the principal opinion or the concurring opinion. The "principal opinion" refers to the opinion of Justice Timmons-Goodson. The "concurring opinion" refers to the opinion of Justice Edmunds.

save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The purpose of the FAA was "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26, 36 (1991); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27, 105 S. Ct. 3346, 3354, 87 L. Ed. 2d 444, 455 (1985) ("[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution."). "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l Hosp.*, 460 U.S. at 24-25, 103 S. Ct. at 941, 74 L. Ed. 2d at 785. Accordingly, the United States Supreme Court has recognized that arbitration can be an appropriate forum for the resolution of federal statutory claims and has enforced agreements to arbitrate such claims. *See, e.g., Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989) (Securities Act of 1933); *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987) (Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi*, 473 U.S. 614, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (Sherman Act).

Likewise, in *Burke County Public School Board of Education v. Shaver Partnership*, this Court held that agreements to arbitrate disputes arising under any contract involving "substantial interstate activity" are enforceable under the FAA "notwithstanding conflicting state law." 303 N.C. 408, 420, 422, 279 S.E.2d 816, 823, 824 (1981). There, we recognized the benefit of "uniformity" in the enforcement of arbitration agreements in state and federal courts. *Id.* at 422, 279 S.E.2d at 824.

It is important to note the interplay between state and federal law with respect to arbitration agreements: federal law makes an arbitration agreement enforceable except when common law principles, such as unconscionability, make it unenforceable. The common law defense must apply to contracts generally and not arise because the subject is an arbitration agreement. *See Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902,

909 (1996) ("Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status . . . ."); *Perry*, 482 U.S. at 493 n.9, 107 S. Ct. at 2527 n.9, 96 L. Ed. 2d at 437 n.9 ("A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.").

Because this case is the first time this Court has held a contract unconscionable, and since the majority agrees that this arbitration agreement is unconscionable because of the collective effect of the arbitration agreement's terms, today's holding creates a preemption issue. The majority finds the agreement unconscionable based on provisions that would only exist in an arbitration agreement. Further, the principal opinion's finding of unconscionability involves a misapplication of a United States Supreme Court test specifically applicable to arbitration costs. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89-92, 121 S. Ct. 513, 521-23, 148 L. Ed. 2d 373, 382-84 (2000).

In short, the majority concludes this arbitration agreement is unconscionable because it contains provisions common to many arbitration agreements. This result is precisely the one rejected recently by the United States Court of Appeals for the Third Circuit. In *Gay v. Credit*Inform, the Third Circuit specifically warned that state court analysis of an arbitration agreement cannot focus on the uniqueness of an arbitration agreement as grounds for unconscionability. 2007 WL 4410362, at *21. Additionally, the Eleventh Circuit has recently upheld an arbitration agreement in the face of challenges similar to those raised in this case, particularly in reference to the class action prohibition and the exceptions to arbitration. *See Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 877 (11th Cir. 2005), *cert. denied*, 546 U.S. 1214, 126 S. Ct. 1457, 164 L. Ed. 2d 132 (2006). These decisions by federal courts of appeals in cases factually analogous to the instant case further underscore the federal preemption issues involved here.

## II. STATE LAW

### A. General Principles of Contract Law

This Court has emphasized the vital role contracts play in our free society:

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

"The right to contract is recognized as being within the protection of the Fifth and Fourteenth Amendments to the Constitution of the United States; and protected by state constitutions. It has been held that the right to make contracts is embraced in the conception of liberty as guaranteed by the Constitution."

*Alford v. Textile Ins. Co.*, 248 N.C. 224, 227, 103 S.E.2d 8, 10-11 (1958) (internal citations and internal quotation marks omitted) (quoting *Morris v. Holshouser*, 220 N.C. 293, 17 S.E.2d 115 (1941)). Like any freedom, the liberty to contract is coupled with corresponding responsibility: "Liberty to contract carries with it the right to exercise poor judgment as well as good judgment. It is the simple law of contracts that 'as a man consents to bind himself, so shall he be bound.' " *Troitino v. Goodman*, 225 N.C. 406, 414, 35 S.E.2d 277, 283 (1945) (citations omitted).

Equally well settled is the role courts should play in interpreting and enforcing contracts: "There can be no dispute that [a] contract between [private parties] . . . there being no mistake or fraud, both being *sui juris*, is a valid and binding one." *Peoples Bank & Tr. Co. v. Mackorell*, 195 N.C. 741, 744, 143 S.E. 518, 520 (1928); *see also id.* at 745, 143 S.E. at 520 (noting further, by way of example, that even " 'though [a] contract was a foolish one, it would hold in law' " (citation omitted)). "The principle is generally conceded, and it is certainly equitable, that when the benefit and the burden of a contract are inseparably connected, both must go together, and liability to the burden is a necessary incident to the right to the benefit. *Qui sentit commodum sentire debet et onus.*" *Norfleet v. Cromwell*, 70 N.C. 510, 516, 70 N.C. 634, 641 (1874) (citations omitted).

We have also recognized that the mere fact that one party to a contract is a large, heavily regulated commercial entity does not, per se, destroy the arm's-length nature of the transaction. In considering enforcement of provisions of an insurance policy, we noted:

The insured and the defendant [insurance company] had the legal right to enter into the contract, and the parties are bound by its terms. In the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability and to impose whatever conditions they please, upon their obligations, not inconsistent with public policy; and the courts have no right to add anything to their contracts or to take anything from them.

. . . We must decide the case, therefore, not by what we may think would have been a wiser and more discreet contract on the part of the plaintiff, if he could have procured such a one, but by what is written in the contract actually made by them. Courts are not at liberty to rewrite contracts for the parties. We are not their guardians, but the interpreters of their words. We must, therefore determine what they meant by what they have said—what their contract is, and not what it should have been.

*Powers v. Travelers Ins. Co.*, 186 N.C. 336, 337-38, 119 S.E. 481, 481-82 (1923) (internal citations and internal quotation marks omitted). Our jurisprudence counsels us to exercise caution in undertaking any judicial inquiry into the wisdom of a contract's terms, such as the one plaintiffs ask us to do here.

### B. Unconscionability Under *Brenner*

On one occasion alone, this Court has addressed the issue of whether a contract should be enforced because of unconscionability. In *Brenner v. Little Red School House, Ltd.*, we recognized that it is only in the exceptional case that a contract will be found unconscionable:

A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable.

302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981) (citations omitted). Applying this rigorous standard, no appellate court in North Carolina has held a contract unenforceable based on unconscionability.

In *Brenner*, the plaintiff sought to recover tuition paid in advance to a private school when his former wife refused to allow the plaintiff's child to attend the school and the child did not attend a single day. *Id.* at 208-09, 274 S.E.2d at 208. Under the terms of the contract between the plaintiff and the school, tuition for the entire school year

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

was "payable in advance on the first day of school, no portion refundable." *Id.* at 208, 274 S.E.2d at 208.

Applying the articulated unconscionability test to "all the facts and circumstances" in *Brenner*, we found that there was no inequality of bargaining power because the plaintiff had other choices of schools, *id.* at 213-14, 274 S.E.2d at 210-11, and that the clause making advance tuition payments on the first day of school nonrefundable "[was] reasonable when considered in light of the expense to defendant in preparing to educate the child and in reserving a space for him," *id.* at 213-14, 274 S.E.2d at 211.

As the majority correctly notes, plaintiffs have the burden to prove unconscionability since they have raised it as an affirmative defense to enforceability of this contract. *Rite Color Chem. Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 20, 411 S.E.2d 645, 649 (1992).

## III. STANDARD OF REVIEW

Preliminarily, I question whether the majority applies the correct standard of review by deferring to the trial court's findings of fact.[4] We apply the deferential "competent evidence" standard to the trial court's findings of fact in cases like *Lumbee River Electric Membership Corp. v. City of Fayetteville*, 309 N.C. 726, 309 S.E.2d 209 (1983), relied upon by the majority, when the trial judge sits as jury and takes live evidence. *Id.* at 740-41, 309 S.E.2d at 218-19. However, when as here, the trial court merely hears arguments on a motion and reviews the same cold record we review now, there is less reason to defer to the trial court as fact finder. For example, we review de novo the trial court's rulings on summary judgment motions, which are argued on a record similar to the one in this case. *Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006) (citing *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004)). Federal appellate courts apply de novo review to district court denials of motions to compel arbitration. *See, e.g.*, *Gay*, 2007 WL 4410362, at *2; *Safer v. Nelson Fin. Grp., Inc.*, 422 F.3d 289, 293 (5th Cir. 2005); *Jenkins*, 400 F.3d at 873; *Kidd v. Equitable Life Assurance Soc'y*, 32 F.3d 516, 518 (11th Cir. 1994), *cert. denied*, 522 U.S. 1028, 118 S. Ct. 626, 139 L. Ed. 2d 606

---

4. Despite contentions to the contrary, the parties did brief the standard of review issue. Both parties included "Standard of Review" sections in their briefs to this Court, with plaintiffs arguing that the Court of Appeals majority did not defer adequately to the trial court and defendants arguing that the deference was appropriate. I believe that this adequately preserves the issue for appellate review. Nonetheless, I do not find the standard of review to be dispositive in this case.

(1997). Additionally, a number of federal courts liken the standard of review for a motion to compel arbitration to the standard for a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See, e.g., Par-Knit Mills Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 & n.9 (3d Cir. 1980); *Hughes v. CACI, Inc.— Commercial*, 384 F. Supp. 2d 89, 92-93 (D.D.C. 2005).[5]

However, even applying the competent evidence standard, I conclude that the facts, as found by the trial court, do not support the legal conclusion that this contract is unconscionable.

## IV. PROCEDURAL UNCONSCIONABILITY

The principal opinion acknowledges that "procedural unconscionability involves 'bargaining naughtiness' in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power." *Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 648. Applying this test, it finds the following to be sufficient to establish procedural unconscionability: the closings were rushed and the arbitration clause not mentioned; the terms were non-negotiable; and the parties' relative status, business and consumer, reflected inequality in bargaining power. Quite frankly, these factors exist in most, if not all, consumer contracts.[6]

Under federal case law interpreting the FAA, there is a question regarding this Court's jurisdiction over plaintiffs' argument that the arbitration agreement is a contract of adhesion. As noted by the principal opinion, the trial court did not extensively address the procedural unconscionability question, but did label the arbitration agreement "a standard-form contract of adhesion." More than four

---

5. It appears that an intermediate option we could have pursued in this case was remanding to the trial court, where any disputed facts revealed by the record could have been addressed in an evidentiary hearing with the opportunity to test statements through cross-examination; this Court has remanded for such hearings in a variety of contexts. *See, e.g., Stephenson v. Bartlett*, 355 N.C. 354, 381, 562 S.E.2d 377, 395 (2002) (legislative redistricting); *State v. McHone*, 348 N.C. 254, 259, 499 S.E.2d 761, 764 (1998) (criminal defendant's motion for appropriate relief); *Meiselman v. Meiselman*, 309 N.C. 279, 306, 307 S.E.2d 551, 567 (1983) (minority shareholder suit to dissolve corporation).

6. In the overall unconscionability analysis, the concurring opinion agrees with the principal opinion in concept, but not terminology. The concurring opinion collapses the procedural and substantive analyses under what it labels as *Brenner's* "totality of the circumstances" test. While not using the term "procedural unconscionability," the concurring opinion's analysis does analyze inequality of bargaining power and the parties' status as business and consumer. In substance, the majority of the members of this Court agree that these factors contribute to a finding of unconscionability.

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

decades ago, the United States Supreme Court held that claims challenging the making of an arbitration agreement specifically are distinguishable from those challenging the contract, in which the arbitration agreement is included, generally. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270, 1277 (1967). The former are reviewable by a court, while the latter are for the arbitrator to decide. *See id.* ("[A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the [FAA] but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts."); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448-49, 126 S. Ct. 1204, 1210, 163 L. Ed. 2d 1038, 1045-46 (2006) ("[T]he *Prima Paint* rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void. . . . We reaffirm today that, regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.").

In this case, neither plaintiffs' arguments nor the majority's analysis regarding procedural unconscionability clearly distinguishes between challenges to the loan agreements and the arbitration agreements contained therein. They emphasize what happened at the loan closing, preparation of the documents by defendants, and the lack of sophistication of these subprime loan applicants. Addressing similar arguments, the United States Court of Appeals for the Eleventh Circuit found that claims regarding the absence of consumer bargaining power, the types of consumers targeted, and the consumers' inability to change the contract terms related to allegations that the consumer loan contract as a whole was adhesive, and thus, those claims were to be decided by an arbitrator, not a court. *Jenkins*, 400 F.3d at 877.

However, even under this state's contract law, the arbitration agreement is not procedurally unconscionable. Many of the factors highlighted by the majority were present in *Brenner*, but did not result in the contract being declared unenforceable. In *Brenner*, there was no discussion whether the defendant explained to the plaintiff the no refund policy; there was no indication the policy was negotiable; and presumably the provider of the service drafted the form agreement and held the keys to the schoolhouse. In our analy-

sis of "inequality of bargaining power," we did not focus on who drafted the agreement or whether any of the specific terms were negotiable. *Id.* at 213-14, 274 S.E.2d at 211. Instead, we equated "bargaining power" with choices in the marketplace: "Plaintiff was not forced to accept [the] defendant's terms, for there were other private and public schools available to educate the child." *Id.* at 213, 274 S.E.2d at 211. Unlike compulsory schooling for children, borrowing funds is optional. Plaintiffs had the choice of whether to borrow. Further, although the trial court did not address the availability of loans from other lenders, one can assume other borrowing options existed in the subprime market. Under our controlling precedent, "[t]here was no inequality of bargaining power between the parties" since plaintiffs had other options. *Id.* They were "not forced to accept defendant[s'] terms." *Id.*

It is also important to note that the arbitration agreement was not hidden or minimized. As the principal opinion observes, this is not a case questioning "whether an arbitration agreement had been properly executed" and "there is no question that plaintiffs signed the agreement." The arbitration agreement alerted each plaintiff to its significance in a number of ways. Although contained in the loan document, the agreement was set off in a separate box and entitled "ARBITRATION PROVISION," which was bolded, capitalized, and underlined. The provision was introduced by the following bold, capitalized font: "READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO OBTAIN REDRESS THROUGH COURT ACTION." As the provision comprised a portion of two pages, plaintiffs initialed the page transition. Directly above the borrower's signature line for the arbitration agreement, the following bold, capitalized statement appeared: "READ THE ABOVE ARBITRATION PROVISION CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO OBTAIN REDRESS THROUGH COURT ACTION." Both plaintiffs signed their respective arbitration agreements separately from the signatures required on the loan agreements—a fact that carries considerable legal significance. *See Leonard v. S. Power Co.*, 155 N.C. 8, 11, 155 N.C. 10, 14, 70 S.E. 1061, 1063 (1911) ("[T]he law will not relieve one who can read and write from liability upon a written contract, upon the ground that he did not understand the purport of the writing, or that he has made an improvident contract, when he could inform himself and has not done so.").

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

Defendants took steps to ensure plaintiffs would be aware of the provision by separating the arbitration agreement from other portions of the loan agreement; employing capitalization, bolding, and underlining; and requiring a separate signature. Furthermore, the loan closing was not the last opportunity plaintiffs had to review the documents and decline the loans. Contained within the arbitration provision is the borrower's right to rescind the loan within three business days. Even if plaintiffs were rushed through the closing, they had three business days to read the documents and rescind the loans if desired.

In sum, the majority's analysis criticizes aspects common to all consumer transactions and fails to find the "bargaining naughtiness" required for finding procedural unconscionability.

## V. SUBSTANTIVE UNCONSCIONABILITY

The principal opinion describes substantive unconscionability as pertaining to whether the terms of the contract are harsh, one-sided, and oppressive.[7] *See Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 648-49. The majority determines that the arbitration agreement here is substantively unconscionable based on the collective effect of its "prohibitively high" and "onerous" arbitration costs, one-sidedness and lack of mutuality, and prohibition of class actions and joinder of claims. I cannot agree. An arbitration costs provision would not be found in any type of contract except an arbitration agreement. Plaintiffs also challenge the exceptions to arbitration, which again, would only be found in an arbitration provision. Finally, plaintiffs' arguments in this case focus on the class action waiver's interaction with the other two provisions that are unique to arbitration. Thus, the unconscionability analysis in this case not only fails under the exceedingly high substantive standard prescribed by our state case law, but also risks preemption by federal law to the extent it relies on features of the instant agreement that would not be found in contracts generally.

To prove substantive unconscionability under *Brenner*, plaintiffs must show that the "inequality of the bargain is so manifest as to shock the judgment" and that the terms of the arbitration agreement "are so oppressive that no reasonable person would make them on

---

7. While not using the term "substantive unconscionability," the concurring opinion criticizes the same arbitration terms as the principal opinion. The concurring opinion proceeds solely under *Brenner*, whereas the principal opinion uses federal case law in its analysis.

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

the one hand, and no honest and fair person would accept them on the other." 302 N.C. at 213, 274 S.E.2d at 210. In *Brenner*, we evaluated substantive unconscionability, as we had with procedural unconscionability, in the context of the marketplace. We found the school's "no refund" policy was reasonable in light of what the student's parent received in return: preparation for his child's education and a reserved place in the ,class. *Id.* at 213-14, 274 S.E.2d at 211. In this case, considering all the facts and circumstances, the terms of the arbitration agreement are "reasonable when considered in light of" the overall transaction. *See id.*[8]

Generally speaking, the loan agreements executed between plaintiffs and defendants included a common exchange. Plaintiffs, who had impaired credit, received a loan. Defendants received a promise by each plaintiff to pay back the loan under terms that would minimize defendants' risk of loss. These terms, including the interest rate, were less favorable than what was available in the conventional market, but defendants were assuming more risk by lending to plaintiffs based on their lower credit ratings. The terms of each agreement, like many other loan agreements in both the conventional and subprime markets, included an agreement to arbitrate claims. There is no question in this case whether it was reasonable for defendants to include an agreement to arbitrate in their extension of credit to plaintiffs. Plaintiffs merely challenge certain terms of that agreement: (1) the costs provisions; (2) the enumerated exceptions to arbitration; and (3) the prohibition on class actions and joinder of claims. Taken together or separately, these terms do not render the arbitration provision unconscionable.

---

8. Contracts for the sale of goods governed by North Carolina's Uniform Commercial Code ("UCC") are subject to the doctrine of unconscionability. *See* N.C.G.S. § 25-2-302 (2007). Although the arbitration agreement here is governed by common law, not the UCC, the UCC's doctrine of unconscionability grew out of the common law. *See Rite Color Chem. Co.*, 105 N.C. App. at 18, 411 S.E.2d at 647-48. The official comment to the statute states:

> The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. [The statute] makes it clear that it is proper for the court to hear evidence upon these questions. *The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.*

N.C.G.S. § 25-2-302 cmt. 1 (emphasis added) (citation omitted). Consistent with *Brenner*, the UCC makes clear that the key inquiry is more about the commercial reasonableness of the contract terms than it is about the relative bargaining positions of the parties.

TILLMAN v. COMMERCIAL CREDIT LOANS, INC.

[362 N.C. 93 (2008)]

## A. Arbitration Costs

The focal point of the majority's analysis is the conclusion that the hypothetical arbitration costs, as stated in the agreement, prevent plaintiffs from vindicating their rights. The principal opinion determines that the costs provision of this arbitration agreement presents a prohibited "barrier" under decisions by the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit. However, the record in this case does not establish that the potential costs of arbitration will deter plaintiffs from "effectively vindicating" their claims of more than $15,000 each.[9] This arbitration fee structure withstands the tests of *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000), and *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549 (4th Cir. 2001).

In *Green Tree*, the United States Supreme Court addressed the issue of arbitration costs when the purchaser of a mobile home brought a purported class action against her lenders, asserting violations of the federal Truth in Lending Act for the lenders' alleged failure to disclose certain finance charges. 531 U.S. at 82-83, 121 S. Ct. at 517-18, 148 L. Ed. 2d at 378-79. With respect to the plaintiff's challenge to the arbitration agreement, the Supreme Court framed the issue as "whether [the plaintiff's] agreement to arbitrate is unenforceable because it says nothing about the costs of arbitration, and thus fails to provide her protection from potentially substantial costs of pursuing her federal statutory claims in the arbitral forum." *Id.* at 89, 121 S. Ct. at 521, 148 L. Ed. 2d at 382. Because of the scant record with respect to arbitration costs in *Green Tree*, the Court found plaintiff had failed to prove the costs were prohibitively expensive. *Id.* at 90-91, 121 S. Ct. at 522, 148 L. Ed. 2d at 383-84. The Court

---

9. Neither party has contested the fact that each plaintiff's claim satisfies the $15,000 threshold triggering the arbitration agreement. The majority focuses on the insurance premiums paid instead of the values of the claims. Both plaintiffs alleged three causes of action seeking compensatory damages, costs, and attorney's fees: (1) unfair and deceptive trade practices ("UDTP") under N.C.G.S. § 75-1.1, (2) unjust enrichment, and (3) breach of duties of good faith and fair dealing. A brief review of the smaller claim, that of Tillman, reveals the value of the claim surpasses the threshold. Tillman's compensatory damages are the amount she paid for the disputed insurance ($2,064.75) plus interest at her contract rate from the date the charges began until judgment, which amounts to approximately $5,000.00. The trebling of the compensatory damages under the UDTP statute meets the $15,000 threshold, even before adding costs and attorney's fees and other potential recoveries. Richardson, having paid disputed insurance premiums of $4,208.75, would have a substantially higher claim.

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

concluded that "[t]he 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91, 121 S. Ct. at 522, 148 L. Ed. 2d at 384. Ultimately, *Green Tree* clarified that: (1) costs are "prohibitive" if they preclude effective vindication of rights in the arbitral forum, *id.* at 90, 121 S. Ct. at 522, 148 L. Ed. 2d at 383, and (2) a party challenging an arbitration agreement must show "the likelihood of incurring [prohibitive] costs," *id.* at 92, 121 S. Ct. at 522, 148 L. Ed. 2d at 384.

In *Bradford*, the United States Court of Appeals for the Fourth Circuit followed these two directives from *Green Tree* when it considered whether a fee-splitting provision rendered an arbitration agreement unenforceable. 238 F.3d at 552. The plaintiff sought redress for his age discrimination claims simultaneously through arbitration and in federal district court. *Id.* at 551-52. In reviewing the costs issue, the Fourth Circuit stated that part of the key inquiry was whether "the expected cost differential between arbitration and litigation in court . . . is so substantial as to deter the bringing of claims." *Id.* at 556. As to the particular case before it, the Fourth Circuit found that the plaintiff had not been deterred from vindicating his rights because he had in fact utilized the arbitral forum. *Id.* at 558.

Initially, I note that defendants argue plaintiffs cannot prove prohibitive costs because the arbitration agreement requires arbitration under the AAA's Consumer Rules enacted subsequent to the execution of plaintiffs' arbitration agreements. Under changes to the rules, if plaintiffs (or any consumers) arbitrate, they will be liable for at most $375 in arbitration costs. The majority rejects this argument by stating "it is inappropriate to rewrite an illegal contract."[10] However, this is not a situation in which defendants are attempting to rewrite a contract provision. Rather, to use AAA as mandated by the arbitration agreement, defendants are required to comply with the new rules by paying most of the arbitration fees. As a result, plaintiffs cannot show they will actually incur prohibitive costs. *Green Tree*, 531 U.S. at 92, 121 S. Ct. at 522, 148 L. Ed. 2d at 384. Other courts have held that an after-the-fact offer from a defendant "to bear the costs of arbitration that [the plaintiff] is unable to afford" prevented the plaintiff from "demonstrat[ing] that arbitration would be prohibitively expensive." *Anders v. Hometown Mortgage Servs., Inc.*,

10. The principal opinion addresses defendants' argument directly. While the concurring opinion is silent, it simply assumes the stated contract terms are the only ones to be considered.

346 F.3d 1024, 1029 (11th Cir. 2003); *see Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 56 (1st Cir. 2002) (holding that "[the defendant's] offer to pay the costs of arbitration and to hold the arbitration in the [plaintiffs'] home state . . . mooted the issue of arbitration costs").

The principal opinion also notes in response to defendants' offer to apply the AAA's Consumer Rules that the arbitration agreement provides that "[t]he terms of this Provision shall control any inconsistency between the rules of [AAA] and this Provision." However, the arbitration agreement contains a severability clause, which should be used to excise this particular sentence. We construe contracts as a whole, give effect to the intent of the parties, and enforce contracts when unenforceable provisions can be severed. *See, e.g., Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989); *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 658-59, 194 S.E.2d 521, 531-32 (1973); *In re Receivership of Port Pub. Co.*, 231 N.C. 395, 397-98, 57 S.E.2d 366, 367-68 (1950). By severing this sentence, the intent of the contract is effectuated through permitting AAA to conduct the arbitration and thereby allowing AAA's Consumer Rules to apply. *See, e.g., State v. Philip Morris USA, Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005). I do not believe severing this one sentence amounts to rewriting the entire agreement. *See Whittaker Gen. Med. Corp.*, 324 N.C. at 528, 379 S.E.2d at 828 ("If the contract is separable . . . and one part is reasonable, the courts will enforce the reasonable provision."); *see also Vecellio & Grogan, Inc. v. Piedmont Drilling & Blasting, Inc.*, 183 N.C. App. 66, 73, 644 S.E.2d 16, 21 ("By striking the offending language [in the indemnification clause] the Court does not rewrite the contract or substitute its own terms in the provision for those of the parties." (citing *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 316, 385 S.E.2d 553, 555 (1989))), *disc. rev. denied*, 361 N.C. 575, 651 S.E.2d 564 (2007).

This Court's refusal to save this arbitration agreement through incorporating the AAA Consumer Rules or applying its severability clause raises the specter of preemption, because it appears we are treating this contract differently from other contracts. The FAA, as interpreted by the United States Supreme Court, does not permit this. *See Doctor's Assocs.*, 517 U.S. at 687, 116 S. Ct. at 1656, 134 L. Ed. 2d at 909; *see also Kristian v. Comcast Corp.*, 446 F.3d 25, 64-65 (1st Cir. 2006) (finding an arbitration agreement's limitation on the recovery of attorney's fees and costs and its class arbitration bar unenforce-

able in an antitrust case, but severing those provisions so that arbitration could proceed).

Even if the costs provisions were applied as written, plaintiffs have not offered more than speculation that they would incur costs. The written terms of the arbitration provision in this case provide that the costs are shifted to the non-prevailing party under two circumstances: when the initial arbitration proceeding exceeds eight hours and after a de novo appeal. The trial court's findings cited by the principal opinion do not address the likelihood that: (1) plaintiffs' initial arbitration hearings would last more than eight hours; (2) the arbitration of plaintiffs' claims would involve an appeal; or (3) plaintiffs would not prevail. The trial court's finding that "the average daily rate of AAA arbitrator compensation in North Carolina is $1,225.00" is not probative of whether the costs are prohibitive without corresponding findings that plaintiffs' arbitration would actually last more than eight hours and plaintiffs are likely to lose. Under the arbitration agreement, plaintiffs must pay $125 to initiate arbitration. In civil court, plaintiffs must pay a $95 filing fee. N.C.G.S. § 7A-305 (2007). Thus, the initial financial hurdle to use both forums is marked by a difference of only $30. Because the trial court did not make any findings as to the likely length of plaintiffs' arbitrations or their likelihood of success, it could not fairly determine the costs plaintiffs would incur beyond the filing fee.

The principal opinion correctly states that *Bradford* requires a comparison of the costs of litigation with the costs of arbitration. However, in this case, the trial court did not perform such an analysis. The evidence presented and relied upon by the trial court compares the costs of litigating a class action and arbitrating as an individual. In actuality, the evidence at issue compares the costs of winning a class action and losing an individual arbitration. Clearly, this is not the proper analysis. The record in this case does not offer proof from which a court can make the correct comparison: the cost to litigate an individual claim in court versus the cost to arbitrate the same claim.

### B. Exceptions to Arbitration

The agreement requires arbitration for all actions in which, as here, a claim exceeds $15,000, except for foreclosure actions. The majority holds this provision unconscionable under *Brenner* because it is "so one-sided that the contracting party is denied any opportunity for a meaningful choice." The majority bases this conclusion on

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

a finding that since 1996, defendants have pursued about 2,000 collection actions in court (of the 68,000 loans made), with an average claim of $7,000, but have pursued no claims in arbitration. The majority concludes the exceptions were "specifically carve[d] out" for the corporate drafter to avoid arbitration. I do not agree.

The arbitration agreement's exclusion from arbitration of claims under $15,000 is not manifestly unreasonable; it was not even designed by this lender. As defendants point out, the American Arbitration Association ("AAA"), which would administer any arbitration between these parties, requires that claims under $15,000 be excluded from arbitration. The $15,000 threshold for arbitration is not arbitrary or specifically designed to favor defendants. This policy of the third-party administrator is intended to benefit consumers by allowing access to the courts for small claims. *See Jenkins*, 400 F.3d at 879 (noting that a "provision providing access to small claims tribunals was intended to benefit, not injure, consumers"). Here, plaintiffs have the option of pursuing their individual claims in civil court by limiting their damages to $15,000 each or seeking a larger recovery in arbitration.

Additionally, the arbitration agreement's exclusion of foreclosure actions is not unreasonable because our statutes give North Carolina superior courts "exclusive jurisdiction" over any action affecting the title to land located in this state. *See* N.C.G.S. § 43-1 (2007). Moreover, our foreclosure statutes contain provisions protecting homeowners. *E.g.*, *id.* § 45-21.16 (2007) (outlining specific requirements for notice and hearing prior to sale); *id.* § 45-21.20 (2007) (allowing satisfaction of mortgage after notice and before sale is completed); *id.* § 41-21.34 (2007) (permitting application to enjoin sale on equitable grounds).

C. Prohibition on Class Actions and Joinder of Claims

The majority affirms the trial court's conclusion that the prohibition on class actions and joinder of claims is a factor to consider in the overall unconscionability analysis. The majority reasons that the prohibition hinders access to a tribunal for "cases with low damages" and benefits only the lender. This analysis ignores the facts of this case in which each plaintiff's claim is greater than $15,000 and arbitration provides an expedient forum for plaintiffs to pursue their remedies.

The principal opinion states that plaintiffs' damages total less than $4,500, but this amount does not take into account accrued

interest and trebling, N.C.G.S. § 75-16 (2007), or that plaintiffs may recover attorney's fees, *id.* § 75-16.1 (2007); *see* note 7 above. Moreover, the mandatory arbitration provision was only triggered in this case because each plaintiff claims damages in excess of $15,000. The "modesty" of the damages sought by plaintiffs is doubtful. When federal courts have held arbitration agreements unconscionable based in part on class action prohibitions, the damages at issue were considerably less than those at issue in this case. *See, e.g., Dale v. Comcast Corp.*, 498 F.3d 1216, 1220 (11th Cir. 2007) ($11 per plaintiff); *Ting v. AT&T*, 319 F.3d 1126, 1134 (9th Cir.) (declaratory and injunctive relief), *cert. denied*, 540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003); *see also Kristian*, 446 F.3d at 54 (damages which if trebled would range "from a few hundred dollars to perhaps a few thousand dollars" in a complex antitrust case); *Leonard v. Terminix Int'l Co.*, 854 So. 2d 529, 535 (Ala. 2002) (per curiam) (less than $500 per plaintiff); *State ex rel. Dunlap v. Berger*, 211 W. Va. 549, 562, 567 S.E.2d 265, 278 ($8.46 for one named plaintiff), *cert. denied*, 537 U.S. 1087, 123 S. Ct. 695, 154 L. Ed. 2d 631 (2002).

The trial court's conclusion that it would be unlikely that attorneys would be willing to represent plaintiffs in the absence of a class action option, while labeled a factual finding, is essentially a legal argument that has been rejected by federal courts. Federal courts of appeals have concluded that the availability of attorney's fees provides sufficient incentive for attorneys to represent clients raising claims similar to those of plaintiffs in this case. *See Jenkins*, 400 F.3d at 878 (recognizing that the availability of attorney's fees provides plaintiffs with adequate access); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir.) (rejecting challenge to a class action waiver based on the plaintiffs' argument that the small amount of individual damages sought would make them unable to obtain legal representation when attorney's fees were available), *cert. denied*, 537 U.S. 1087, 123 S. Ct. 695, 154 L. Ed. 2d 631 (2002); *Johnson v. W. Suburban Bank*, 225 F.3d 366, 374 (3d Cir. 2000) (finding that class action waivers in arbitration proceedings do not "necessarily choke off the supply of lawyers willing to pursue claims on behalf of debtors"), *cert. denied*, 531 U.S. 1145, 121 S. Ct. 1081, 148 L. Ed. 2d 957 (2001); *see also Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 559 (7th Cir. 2003) (enforcing an arbitration provision specifically prohibiting class action arbitration).

Further, apart from plaintiffs' attorney's own averments, there is no evidence in the record that other attorneys would refuse to take

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

the case of a client seeking more than $15,000 in damages.[11] Many cases seeking damages lower than those sought here are litigated through our appellate court system. *See, e.g., Wright v. Murray*, —— N.C. App. ——, ——, 651 S.E.2d 913, 914 (2007) (finding no abuse of discretion when trial court ordered $25,000 in attorney's fees following the jury's award of $7,000 to the plaintiff); *Dysart v. Cummings*, 181 N.C. App. 641, 645, 640 S.E.2d 832, 835 (seeking $10,500 in damages plus costs and attorney's fees), *aff'd per curiam*, 361 N.C. 580, 650 S.E.2d 593 (2007). While it is uncontested that plaintiffs cannot afford to hire an attorney on an hourly basis, there is nothing in the arbitration agreement itself that precludes an attorney from taking a consumer's case in arbitration on a contingency basis. The very fact that plaintiffs retained counsel on a contingency fee basis in this matter weighs against a finding that representation would be unavailable.

## VI. APPLICATION OF RECENT FEDERAL CASES

The majority upholds the trial court, which concluded that the three provisions taken together made the arbitration agreement unconscionable. Implicit in this conclusion is that none of these provisions standing alone would result in unconscionability. Not only does state law not support the trial court's conclusion, but the majority's approach is inconsistent with federal decisions interpreting the FAA. As illustrated by two recent federal court of appeals cases with similar facts, when reviewing elements of an arbitration agreement

---

11. In several of its findings of fact, the trial court relies on information contained in the affidavit of plaintiffs' attorney. Reliance on the affidavit raises two concerns. First, under Rule 3.7 of the North Carolina Rules of Professional Conduct, "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." N.C. St. B. Rev. R. Prof. Conduct 3.7 (Lawyer as Witness), 2007 Ann. R. N.C. 717, 812. In this case, the propriety of plaintiffs' own counsel providing an affidavit concerning not merely "services rendered in [this] case" but also regarding his opinion whether it would be "feasible to pursue claims such as this on an individual basis" is questionable under the rule.

Second, defendants moved to compel discovery on matters related to litigation and arbitration costs. The trial court denied this motion. Subsequently, two days before the hearing on defendants' motion to compel arbitration, plaintiffs' counsel submitted the affidavit at issue addressing the same information counsel had refused to disclose during discovery. Defendants moved to strike this affidavit. The trial court did not rule on the motion to strike, but relied on the affidavit in its findings of fact regarding the costs of litigation. Given this reliance, at a minimum, defendants should have been given the opportunity to probe the substance of the affidavit.

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

that are unique to arbitration agreements, state law must defer to federal principles.

In *Jenkins v. First American Cash Advance of Georgia, LLC,* the Eleventh Circuit considered whether an arbitration agreement between a consumer and a payday lender was unconscionable. 400 F.3d at 870-71. The terms of the agreement were similar to, but more strident than, those found in this case. Costs for arbitration were advanced by the lender only upon a consumer's request, and then the arbitrator had complete discretion to award attorney's fees and costs to the prevailing party, if applicable law allowed. *Id.* at 872. The arbitration agreement contained a small claims exception similar to the one in this case, with one important difference: small claims decisions could be appealed to an arbitrator. *Id.*

The trial court in *Jenkins* found that the agreement was substantively unconscionable because it prohibited class actions and because it lacked mutuality of obligation in that its small claims exception would only benefit the lender. *Id.* at 876. The trial court noted that individually these provisions might be insufficient, but "considered together," they made the arbitration agreement unconscionable. *Id.* The Eleventh Circuit disagreed. As to the class action waiver, even though none of the loans was greater than $500, *id.* at 871, the appeals court concluded that the availability of attorney's fees was sufficient incentive for lawyers to represent consumers under the applicable arbitration agreement, *id.* at 878. Further, the court concluded that the class action prohibition would not have the practical effect of immunizing the lenders because the arbitration agreement permitted the consumer to vindicate all of her substantive rights. *Id.* Regarding the exception allowing small claims actions to be brought in a judicial forum, the court noted that this option was equally applicable to both consumer and lender. *Id.* at 879. The court found the exception was intended to benefit, not injure, consumers as part of a larger Consumer Due Process Protocol developed by AAA. *Id.* Moreover, the Eleventh Circuit concluded that the arbitral forum itself does not unfairly favor the lender because the arbitrator was permitted to award the consumer the full range of relief available under the applicable statute. *Id.* at 880.

Likewise, in *Gay v. Credit*Inform, the Third Circuit considered whether an arbitration agreement between a consumer and a credit repair services company was unconscionable. 2007 WL 4410362, at *1. The court's analysis focused on the class action waiver contained

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

in the agreement, *id.* at \*18-20, noting the "competing interests" at play: "the promotion of arbitration agreements and the protection of class actions prohibited by such agreements," *id.* at \*20. Quoting from an earlier decision, the Third Circuit observed " '[w]hatever the benefits of class actions, the FAA *requires* piecemeal resolution when necessary to give effect to an arbitration agreement.' " *Id.* (quoting *Johnson*, 225 F.3d at 375 (alteration in original) (citation and internal quotation marks omitted)). The court specifically noted that state court analysis cannot focus on the uniqueness of an arbitration agreement. *Id.*[12] It further found that such "reasoning if applied logically could result in a significant narrowing of the application of the FAA." *Id.* at \*21. The Third Circuit in *Gay* concluded: "[O]ur obligation is to honor the intent of Congress and that is what we are doing. If the reach of the FAA is to be confined then Congress and not the courts should be the body to do so." *Id.*

These cases highlight the important principles implicated by today's decision. *Jenkins*, with its similar facts, supports a conclusion that the instant arbitration agreement's terms do not cross the high bar of unconscionability. *Gay* underscores the difficulty a state court has in attempting to parse an arbitration agreement's terms under the FAA. Both decisions undercut the majority's conclusion here, which finds an arbitration agreement unconscionable based upon the very terms that make it an arbitration agreement.

---

12. In *Gay*, the Third Circuit specifically criticized two Pennsylvania state court decisions, one of which involved the same arbitration clause used by defendants in this case. 2007 WL 4410362, at \*18-21. In *Lytle v. CitiFinancial Services, Inc.*, 2002 PA Super. 327, 810 A.2d 643, the Pennsylvania Superior Court vacated the trial court's order dismissing the plaintiffs' complaint and remanded for the trial court to hold a hearing on whether there existed "a business reality which precluded CitiFinancial from agreeing to be bound by the arbitration provisions." *Id.* at ¶ 44, 810 A.2d at 668. If CitiFinancial were able to prove "a compelling basis for the one-sided arbitration clause," then the trial court was to allow the plaintiffs to offer proof on the issues of costs of arbitration as contrasted to court proceedings and the feasibility of obtaining relief in the absence of a class action mechanism. *Id.* at ¶ 45, 810 A.2d at 668. The Third Circuit specifically stated that *Lytle* violated section 2 of the FAA "[t]o the extent . . . that [it held] that the inclusion of a waiver of the right to bring judicial class actions in an arbitration agreement constitutes an unconscionable contract." *Gay*, 2007 WL 4410362, at \*20.

Notably, the Pennsylvania Supreme Court, when reviewing a question on certification from the Third Circuit, disavowed *Lytle's* holding: "While we believe that *Lytle* was well intentioned in its effort to guard against pernicious lending practices, our conclusion here is that it swept too broadly. Under Pennsylvania law, the burden of establishing unconscionability lies with the party seeking to invalidate a contract, including an arbitration agreement . . . ." *Salley v. Option One Mortgage Corp.*, 592 Pa. 323, 347, 925 A.2d 115, 129 (2007).

**TILLMAN v. COMMERCIAL CREDIT LOANS, INC.**

[362 N.C. 93 (2008)]

## VII. CONCLUSION

At its core, this case is about plaintiffs' challenge to an arbitration agreement that substitutes individual arbitration for class action litigation in court. Federal law does not permit plaintiffs to challenge this agreement simply because it designates an alternative forum for dispute resolution. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519, 94 S. Ct. 2449, 2457, 41 L. Ed. 2d 270, 280 (1974) (recognizing that arbitration agreements are essentially forum selection clauses).

Further, under this Court's case law, a plaintiff seeking to prove a contract unconscionable must show its terms "shock the judgment of a person of common sense" and "are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Brenner*, 302 N.C. at 213, 274 S.E.2d at 210. Since 1996, 68,000 loans were made containing this arbitration provision. Having considered "all the facts and circumstances of [this] particular case," I do not believe the provisions of this agreement are shocking or so oppressive that a reasonable, honest, and fair person would not offer or agree to them. I believe "[t]he bargain was one that a reasonable person of sound judgment might accept." *Id.* at 214, 274 S.E.2d at 211. Beyond that, we are not allowed to inquire " 'as to whether the contract was good or bad, whether it was wise or foolish.' " *Id.* (citation omitted).

Because plaintiffs have failed to prove procedural and substantive unconscionability as required by *Brenner*, I do not believe this case presents the landmark occasion for invalidating a bargain due to unconscionability. Justice Oliver Wendell Holmes warned of cases such as this:

> Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

*N. Sec. Co. v. United States*, 193 U.S. 197, 400-01, 24 S. Ct. 436, 468, 48 L. Ed. 679, 726 (1904) (Holmes, J., Fuller, C.J., & White & Peckham, JJ., dissenting). I fear that certain "well settled principles of law"

have been bent, not to straighten again. Accordingly, I would affirm the Court of Appeals.

Chief Justice PARKER joins in this dissenting opinion.