Pfeifer, J.,
dissenting.
{¶ 50} I dissent for several reasons. First, I would hold that any nursing-home preadmission arbitration agreement is unconscionable as a matter of public policy. Alternatively, I would hold that the specific agreements in this case were unconscionable as a matter of public policy. More narrowly, I would hold that the arbitration agreements in this case were both substantively and procedurally unconscionable.
I
{¶ 51} In its analysis of the details of this particular matter, the majority ignores the big picture. This is an important case. This court should declare all nursing-home preadmission arbitration agreements unenforceable as a matter of public policy. Arbitration clauses that limit elderly or special-needs patients’ access to the courts for claims of negligence or abuse in their care should simply not be honored or enforced by the courts of this state. The General Assembly has enunciated a public policy in favor of special protection of nursing-home residents through its passage of the Ohio Nursing Home Patients’ Bill of Rights, R.C. 3721.10 et seq. “[W]here there is a strong public policy against a particular practice, a contract or clause inimical to that policy will likely be declared unconscionable and unenforceable unless the policy is clearly outweighed by some legitimate interest in favor of the individual benefited by the provision.” 8 Williston on Contracts (4th Ed.1998) 43, Section 18:7.
{¶ 52} This court today has provided its imprimatur to arbitration agreements that enable nursing homes to avoid the enforcement of the rights and protections *74 provided to nursing-home residents by the General Assembly. The mantra that arbitration is always to be favored must not be mindlessly muttered. In some areas, arbitration is not appropriate; the protection of nursing-home residents is certainly one such area.
{¶ 53} A public policy against preadmission arbitration agreements is reflected in the Ohio Nursing Home Patients’ Bill of Rights. Further, this court should recognize a public policy against preadmission arbitration agreements based upon the practical inappropriateness of such agreements for nursing-home residents.
A
(¶ 54} By enacting the Ohio Nursing Home Patients’ Bill of Rights, R.C. 3721.10 et seq., the General Assembly has demonstrated particular interest in ensuring the rights of nursing-home patients and has provided statutory remedies for those patients whose rights are violated. R.C. 3721.13(A) specifically enumerates 32 important rights, including the right “to a safe and clean living environment” (R.C. 3721.13(A)(1)), the right “to be free from physical, verbal, mental, and emotional abuse and to be treated at all times with courtesy, respect, and full recognition of dignity and individuality” (R.C. 3721.13(A)(2)), “the right to adequate and appropriate medical treatment and nursing care and to other ancillary services that comprise necessary and appropriate care consistent with the program for which the resident contracted” (R.C. 3721.13(A)(3)), the right “to have all reasonable requests and inquiries responded to promptly” (R.C. 3721.13(A)(4)), the right “to have clothes and bed sheets changed as the need arises, to ensure the resident’s comfort or sanitation” (R.C. 3721.13(A)(5)), and the right “to voice grievances and recommend changes in policies and services to the home’s staff, to employees of the department of health, or to other persons not associated with the operation of the home, of the resident’s choice, free from restraint, interference, coercion, discrimination, or reprisal” (R.C. 3721.13(A)(31)).
{¶ 55} R.C. 3721.17 contains the enforcement provision of the Ohio Nursing Home Patients’ Bill of Rights. Pursuant to R.C. 3721.17(I)(l)(a), “[a]ny resident whose rights under sections 3721.10 to 3721.17 of the Revised Code are violated has a cause of action against any person or home committing the violation.” The use of injunctive relief to achieve a proper level of care is clearly contemplated by the General Assembly. The General Assembly calls for the award of attorney fees when residents resort to injunctive relief. In cases “in which only injunctive relief is granted, [the court] may award to the prevailing party reasonable attorney’s fees limited to the work reasonably performed.” R.C. 3721.17(I)(2)(c).
{¶ 56} R.C. 3721.17 also allows residents to employ other methods to ensure their rights. Those include reporting violations of the Ohio Nursing Home Patients’ Bill of Rights to the grievance committee established at the home pursuant to R.C. 3721.12(A)(2). The statute requires that a combination of *75 residents, sponsors, or outside representatives outnumber nursing-home staff two to one on such committees. Another statutory option for residents is to pursue a claim through the Department of Health. R.C. 3721.031.
{¶ 57} The General Assembly has given nursing-home residents rights and a multitude of ways to preserve those rights. An agreement to arbitrate all disputes flies in the face of the statutory protections of nursing-home residents and should be found unconscionable as a matter of public policy.

B

{¶ 58} Practical realities make arbitration agreements signed prior to admission to nursing homes contrary to public policy. Proving substantive unconscionability is unduly burdensome in the nursing-home context, and that fact is illustrated in this particular case. To escape an arbitration agreement, elderly persons must recall with clarity — months or years after the execution of the agreement — what happened at the signing, what was or was not explained to them, and what they understood at the time. The sad fact is that a stay at a nursing home most often signals deterioration. That happened in this case. Within a month of entering Oakridge, Florence Hayes fractured her hip. She was never well enough to return to Oakridge before her death. Now her attorney must attempt to prove, without her, what happened when Florence Hayes executed her arbitration agreements. The types of problems in this case are likely to be universal among nursing-home residents.
{¶ 59} Further, physical and mental deterioration prevents nursing-home residents from taking advantage of the option to rescind an agreement. An arbitration agreement may have a very fair opt-out clause, but it is worthless to someone unable physically or mentally to take advantage of it.
{¶ 60} By the time an arbitration clause is put into play, either time or the nursing home’s own negligence can leave the resident without the ability to recall whether the agreement was validly entered into. The special circumstances attendant to nursing-home care require a judgment from this court that preadmission arbitration agreements are contrary to public policy.
II
{¶ 61} Even if this court is unwilling to find all preadmission arbitration agreements in the nursing-home setting to be contrary to public policy, it should find that the specific agreements in this case were unconscionable and unenforceable as a matter of public policy.
{¶ 62} Pursuant to R.C. 3721.17(I)(2)(b), “[i]f compensatory damages are awarded for a violation of the resident’s rights, section 2315.21 of the Revised Code shall apply to an award of punitive or exemplary damages for the violation.” *76 The General Assembly has determined that punitive damages and attorney fees should be available to nursing-home patients in order to protect their statutory rights. The arbitration agreements in this case remove the possibility of a resident acquiring either. The pertinent provision appears midway through the arbitration agreements, not in the introductory “Explanation” portion of the agreements, nor in the bolded, all capitalized “Acknowledgement” section. It reads:
{¶ 63} “Each party may be represented by counsel in connection with all arbitration proceedings and each party agrees to bear their own attorney fees and costs. Payment of any other awards, fees and costs associated with these arbitration proceedings shall be determined by the panel of arbitrators, provided that the award in arbitration shall not include any amount for exemplary or punitive damages.”
{¶ 64} In regard to punitive damages, the cold truth is that for elderly nursing-home patients, compensatory damages alone are limited as a practical matter. Life expectancy is short, lost wages are nonexistent, and in many cases, the elderly victim may be unable to communicate the true extent of his or her injuries. The threat of punitive damages operates as another incentive for nursing homes to respect the dignity of their residents.
{¶ 65} The availability of attorney fees ensures that nursing-home residents are not hindered from exerting their rights by the specter of cost. Under the Ohio Nursing Home Patients’ Bill of Rights, residents can seek to enforce the many rights set forth in the statutes through injunctive relief and can recover the attorney fees necessary to obtain that relief. An arbitration agreement that removes the possibility of a recovery of attorney fees takes the teeth out of a key enforcement provision of that legislation. Not only do the agreements in this case deny recovery of attorney fees, but they further defy the Ohio Nursing Home Patients’ Bill of Rights by requiring the residents to pay their share of the cost of the arbitration. Residents know that any attempt to enforce their rights will be costly. That is exactly the opposite of the General Assembly’s intent.
{¶ 66} Although the arbitration agreements in this case prohibit punitive damages and attorney fees for both parties, the practical reality recognized by the statute is that only a resident could ever hope to recover them. Oakridge is giving up nothing.
{¶ 67} The General Assembly has identified nursing-home residents as being particularly vulnerable and has instituted protections for them. The arbitration agreements in this case are one-sided and strip away statutory protections that the General Assembly has determined to be necessary for the welfare of residents. The General Assembly has spoken clearly as to the public policy of *77 this state, and the agreements in this case just as clearly flout the will of the people. They are unconscionable and unenforceable as a matter of public policy.
Ill
{¶ 68} The majority does not address uneonscionability from the perspective of public policy, instead deciding the case on the basis of procedural and substantive uneonscionability. Even under that approach, today’s decision is wrongly decided. The arbitration agreements at issue are both procedurally and substantively unconscionable.

A

{¶ 69} The substantive uneonscionability of the arbitration agreements at issue in this case is discussed in Part II, above. The agreements strip away statutory protections granted to nursing-home residents by the General Assembly in the Nursing Home Patients’ Bill of Rights. The agreements forbid an award of punitive damages or attorney fees without any explanation that those rights are both statutorily guaranteed. The agreements are one-sided in their results and defeat the will of the legislature. They are thus substantively unconscionable.

B

{¶ 70} The party challenging a contract as unconscionable must prove a quantum of both procedural and substantive uneonscionability. Taylor Bldg. Corp. of Am. v. Benfield, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 34. However, substantive and procedural uneonscionability need not be present in equal measure in the agreement in question:
{¶ 71} “ ‘Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.’ (15 Williston on Contracts (3d ed. 1972) 1763A, pp. 226-227 * * *.) In other words, the more substantively oppressive the contract term, the less evidence of procedural uneonscionability is required to come to the conclusion that the term is unenforceable, and vice versa.” Armendariz v. Found. Health Psychcare Servs., Inc. (2000), 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.
{¶ 72} In other words, “ ‘[T]he substantive/procedural analysis is more of a sliding scale than a true dichotomy. The harsher the clause, the less “bargaining naughtiness” that is required to establish uneonscionability.’ ” Tillman v. Commercial Credit Loans, Inc. (2008), 362 N.C. 93, 103, 655 S.E.2d 362, quoting Tacoma Boatbuilding Co. v. Delta Fishing Co. (W.D.Wash.1980), 28 U.C.C.Rep. Serv. (CBC) 26, 37, fn. 20. The seriousness of the substantive uneonscionability of the arbitration agreements in this case requires proof of only minor procedural uneonscionability.
*78 {¶ 73} The majority opinion does not seriously address the procedural unconscionability in this case. The first syllabus paragraph responds to nothing but a straw man. It reads: “An arbitration agreement voluntarily executed by a nursing-home resident upon her admission and not as a precondition to admission is not rendered procedurally unconscionable solely by virtue of the resident’s age.” (Emphasis added.) No one has argued that the arbitration agreements in this case are procedurally unconscionable solely by virtue of Florence Hayes’s age. The fact that Florence Hayes was 95 years old is merely one relevant fact. Her age is not enough to make a contract she entered into procedurally unconscionable; nonagenarians are capable of forming valid contracts.
{¶ 74} On the day she signed the two arbitration agreements — one for malpractice claims and one for other claims — factors beyond age were working against Florence Hayes. Oakridge, part of a company owning 200 elder-care facilities, presented Florence Hayes with a preprinted form. Oakridge does not dispute that Florence Hayes was a 95-year-old woman who was debilitated enough to require transport in an ambulance from a hospital to nursing-home care. Still, those facts may not be enough to render a contract procedurally unconscionable. But additionally, the arbitration contracts in this case were presented to her on the very day she was entering the nursing home, an emotional if not traumatic occasion for any person. Additionally, on the day that this 95-year-old was being admitted, Oakridge gave her at least 29 pages of documents to review. Additionally, among those 29 pages of documents, Florence’s signature or initials were required in 11 different places. Additionally, every document — except the arbitration agreements — related to the care Florence would receive in the Oakridge Home. Oakridge claims that signing the arbitration agreements was not required for admission to the facility. Why, then, were they included with the admission documents? Why would documents having absolutely nothing to do with Florence’s care plan be presented to her amidst the documents that were related to her care plan? Florence Hayes did not go to Oakridge to bargain over an arbitration agreement; she went to Oakridge to be taken care of. The arbitration agreements were of a completely different character from the other documents she was signing.
{¶ 75} Additionally, the arbitration agreements on their face present an unbalanced characterization of the benefits of arbitration versus litigation. The introductory “Explanation” part of the arbitration agreements provides: “Arbitration is a method of resolving disputes without the substantial time and expense of using the judicial system. An arbitration hearing takes only weeks or months to schedule, while civil litigation generally takes years to complete.” That apples-to-oranges comparison speaks only of the time involved in scheduling an arbitration, while it talks of the time it takes to complete litigation. Further, it does not account for the likelihood of the completion of litigation through settlement. The *79 “Explanation” further provides, “By avoiding the judicial system, many costs are eliminated.” The statement, however, does not mention that in arbitrations, discovery can be limited. Finally, the “Explanation” concludes, “By signing [this agreement], you will give up your constitutional right to a jury or court trial and you agree that any dispute between you and the facility will be subject to arbitration.” The Explanation does not mention that the agreement forbids exemplary or punitive damages or an award of attorney fees.
{¶ 76} Above the signature line in the “Acknowledgements” section of the agreements, there is a statement in bold, capital letters that again makes no mention of a prohibition of punitive damages and attorney fees:
{¶ 77} “THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ THIS ARBITRATION AGREEMENT AND UNDERSTANDS THAT BY SIGNING THIS ARBITRATION AGREEMENT EACH HAS WAIVED HIS/HER RIGHT TO A TRIAL, BEFORE A JUDGE OR JURY, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF THE TERMS OF THE ARBITRATION AGREEMENT.”
{¶ 78} The arbitration agreements in this case are stingy with any acknowledgement of the drawbacks of arbitration. Oakridge in this case used its expertise and superior bargaining position to create boilerplate documents designed to draw in its residents and presented them at a time when residents would believe that the execution of the arbitration agreements was necessary for admission.
{¶ 79} Thus, this case does not present the question of whether a 95-year-old should be free to enter into any contract. Instead, we are called upon to look at the unique circumstances surrounding the execution of the specific arbitration agreements involved in this case. Here, we have a 95-year-old woman in a fragile state, burdened with the emotions of entering a nursing home, inundated with paperwork and requests for her signature, who would have reason to believe that the documents she was executing were necessary for her admission into the facility, and who has been presented an overly rosy picture of the benefits of arbitration in a nonnegotiated contract that she never sought. All of these facts are in the record and briefs. That she was infirm and 95 years old is the least of the factors that make the arbitration agreements procedurally unconscionable.
{¶ 80} The relative bargaining positions of the parties, the circumstances surrounding the execution of the agreement, and the misleading characterization of the benefits of arbitration in the agreements themselves are all evidence of the procedural unconscionability of the arbitration agreements.

C

{¶ 81} Since the arbitration agreements are both substantively and procedurally unconscionable, they are invalid.
*80 Dickson & Campbell, L.L.C., and Blake A. Dickson, for appellee.
Buckingham, Doolittle & Burroughs, L.L.P., Dirk E. Riemenscheider, Beth A. Nagel, Thomas R. Himmelspach, and Timothy A. Spirko, for appellant.
IY
{¶ 82} The tactics employed by Oakridge and countenanced by the majority in this case are appalling. This court today provides a roadmap for nursing-home facilities to avoid the responsibilities of the Ohio Nursing Home Patients’ Bill of Rights.
{¶ 83} Is it really acceptable to shove an arbitration agreement under the nose of a 95-year-old woman, newly arrived at the nursing home, as she goes through the signing frenzy of the admission process? Does the majority really believe that Florence Hayes knowingly and voluntarily gave up her statutory rights through a negotiation process?
{¶ 84} The majority suggests that the Constitution demands today’s result and that it is this court’s duty to defend the right to private contract. The majority writes: “Our citizens do not lose their constitutional rights and liberties simply because they age.” Yes, somewhere in the penumbra of the penumbra of the right to contract, if you squint just so, you can make out what the majority identifies today: the right of the elderly to be “taken in” by nursing homes. This court’s corollary right for nursing homes is the right to say, ‘You signed it. Live with it! Ohio Nursing Home Patients’ Bill of Rights? You waived it! Your fundamental constitutional rights? You waived them too! And don’t forget to remind your son that we need next month’s check for $5,500 by the first.”